Appeal No. 2015-1103

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**SUMMIT DATA SYSTEMS LLC,**

*Plaintiff-Appellant,*

v.

**NETAPP INC.,**

*Defendant-Appellee.*

**Appeal from the United States District Court
for the District of Delaware,
Case No. 1:10-CV-00749-GMS,
Judge Gregory M. Sleet.**

## NETAPP INC.'s RESPONSIVE BRIEF TO SUMMIT DATA SYSTEMS LLC'S MOTION TO SUPPLEMENT THE RECORD

Edward R. Reines
Byron C. Beebe
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3022

*Attorneys for Defendant-Appellee*

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendant-Appellee NetApp Inc. certifies as follows:

1. The full name of every party or amicus represented by us is:

   NetApp Inc.

2. The name of the real party in interest represented by us is:

   N/A

3. All parent corporations and any public companies that own 10 percent or more of the stock of the parties represented by us are:

   None

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:

   Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell LLP;
   Edward R. Reines, Byron C. Beebe, Anish Desai, Weil Gotshal & Manges LLP;
   Brian E. Farnan, Farnan LLP;
   Michael R. Franzinger, Sidley LLP

## <u>INTRODUCTION</u>

Plaintiff-Appellant Summit Data Systems LLC ("Summit") appeals from a District Court's grant of NetApp Inc.'s ("NetApp") motion to declare this an exceptional case and to award attorneys' fees. In the apparent hope that adding new material to the record will bolster its unavailing appeal argument that the District Court abused its discretion in this matter, Summit has moved to supplement the trial court record with a portion of deposition transcript that neither party submitted to the District Court when the motion under review was decided.

Summit actively participated in the deposition and fails to provide any justification for failing to provide the deposition page to the District Court so it could be considered when the attorneys' fees motion under review was decided. Summit does not deny that it had the opportunity to submit the deposition page to the District Court.

Summit asks this Court to grant its motion through the Court's "inherent equitable powers to supplement the record as justice requires." Dkt. No. 15 (Motion at 3). But it would be inequitable to review the District Court's resolution of a motion based on material that was not even provided to the District Court for consideration. This is all the more true because Summit's motion fails to explain why Summit did not submit this material to the District Court. NetApp therefore opposes Summit's motion to supplement the record.

## LEGAL STANDARD

The record on appeal consists of "the original papers and exhibits filed in the district court," hearing transcripts, and certified copies of docket entries prepared by the clerk. Fed. R. App. P. 10(a). It is thus "generally limited to that which was before the district court." *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1116 (Fed. Cir. 2000). Where evidence was not submitted to the district court, it is generally improper to consider the evidence on appeal. *Delaware Valley Floral Group, Inc. v. Shaw Rose nets, LLC*, 597 F.3d 1374, 1380 n.1 (Fed. Cir. 2010). Although this Court may exercise its discretion to admit new evidence, the Court is "especially reluctant to expand the record on appeal, where, as here, the party seeking expansion of the record offers no reasonable basis for its failure to produce the preferred evidence at an earlier time." *Moore*, 229 F.3d at 1116.

## ARGUMENT

The additional deposition transcript page that Summit seeks to add to the record was available when this issue was briefed to the District Court. Yet Summit did not find it worthwhile to submit, cite, or reference that testimony in support of its opposition.

Contrary to Summit's unsupported claim that NetApp wishes "to cite only half of a line of questioning and intentionally omit those portions that undercut its argument," Dkt. No. 15 (Motion at 7), NetApp did not even rely upon the final

2

page of the transcript currently in the record (page 68).  Rather, an earlier question

and answer on page 67 of the transcript was cited by NetApp to confirm the

authenticity of an RPX license that was submitted to the District Court, and to

show the benefits of being an RPX member.  Dkt. No. 15 (Ex. D at 5).  If

additional evidence from that deposition were relevant to Summit's opposition,

that evidence was available and known to Summit at the time of briefing.  Yet

Summit chose not to present or rely upon it.  Summit has submitted no justification.

### 1.  Summit Was Aware Of This Evidence But Chose Not To Submit It

The evidence Summit seeks to introduce on appeal to buttress its opposition

to the attorneys' fees award on review consists of a portion of the deposition of its

CEO, Dooyong Lee, that was taken on April 13, 2012.  That was nearly a year

before NetApp filed its opening brief seeking fees for Summit's improper conduct.

Dkt. No. 15 (Ex. B at  1; Ex. D. at 1).  Counsel for Summit participated in the

deposition and represented the witness.  NetApp included portions of the

deposition with its motion.  Dkt. No. 15 (Ex. B).  Despite having access to

NetApp's arguments and the evidence supporting and surrounding them, Summit

did not address its CEO's deposition testimony in its opposition, much less include

additional portions of his deposition with its responsive papers.  Exhibit 1

[Summit's opposition brief regarding motion for attorneys' fees and costs].

3

Summit's motion provides no explanation for this litigation decision.  Indeed, it fails to explain why it chose to ignore the evidence it now claims is necessary for a proper review on appeal.  Thus, Summit's position is no different from that rejected in *Moore*, where the supplemental evidence had been available "while litigation was ongoing."  *Moore*, 229 F.3d at 1116.  In *Moore*, as here, there was no reason to expand the record on appeal when the requesting party could offer "no reasonable basis for its failure to produce the preferred evidence at an earlier time."  *Id.*; *see also Delaware Valley Floral Group,* 597 F.3d at 1380 n.1 ("To the extent that Shaw offers this testimony to bolster its argument that summary judgment was inappropriate, we will not consider it here.  This evidence could not have been considered by the district court at that time.").

### 2.  The District Court Did Not Rely On A Misleading Record

Instead of justifying its failure to submit evidence to the District Court, Summit contends that without supplementation the record will be misleading and incomplete because the District Court relied upon the allegedly incomplete portions of the record.  Dkt. No. 15 (Motion at 4, 6).  This is not true.

The District Court did not rely on the allegedly incomplete excerpt cited by Summit in its pending motion.  Summit cites to the end of page 68 of Mr. Lee's deposition, Dkt. No. 15 (Motion at 4-5), and then claims that the District Court "relied on the cited portions of Mr. Lee's deposition in ruling on NetApp's Motion

4

for Attorneys' Fees and Costs." Dkt. No. 15 (Motion at 6). But the actual citation contained in the Court's Memorandum is to *page 67* of Mr. Lee's deposition, the same citation made by NetApp in its fee motion, and to the actual RPX agreement itself. Dkt. No. 15 (Ex. A at 2 (citing to "D.I. 237, Ex. 3 at 67; Ex. 8")). Thus, the page and line Summit now contends creates a misleading and incomplete record was not referenced at all by the Court.

Moreover, the testimony referred to by Summit is not relevant to the Court's decision. In the Court's Memorandum, the reference to Mr. Lee's testimony only supports the fact that Summit entered into an agreement with RPX. Dkt. No. 15 (Ex. A at 2). The Court's actual analysis of the effect of that agreement turns on a statement that Summit cannot contest—its own admission. Dkt. No. 15 (Ex. A at 7 (finding "Summit did not appear to find the License Agreement ambiguous when it readily concurred in its email that 'no product sold by NetApp can be used in an infringing manner when the end user employs Microsoft's initiator software.'")). Summit's new evidence is irrelevant to determining whether the District Court abused its discretion.

Finally, while Summit repeatedly suggests that NetApp inappropriately limited the record by "intentionally omitting" page 69 of Mr. Lee's deposition, Dkt. No. 15 (Motion at 1, 3, 5, 7), there is simply no truth to this position. Page 69 of Mr. Lee's deposition was not included by NetApp because it was not relevant to

5

any fact or issue cited in NetApp's motion.  NetApp had already included pages 66 and 68 from Mr. Lee's deposition for context although only citing to page 67 for its argument.  There was no reason to include additional pages.  If evidence was relevant to Summit's positions, it was Summit's obligation to present that evidence to the District Court.  Summit did not do so and cannot now retroactively change the record.

## CONCLUSION

For the above reasons, the Court should not take the exceptional step of supplementing the record on appeal to introduce evidence that was known by and in the possession of Summit but not submitted to the District Court as relevant to the decision now on review.

Dated:  January 5, 2015                    Respectfully submitted,

By  /s/ Edward R. Reines

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

*Attorneys for  Defendant-Appellee*

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUMMIT DATA SYSTEMS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 1:10-cv-00749-GMS |
| | : | |
| EMC CORPORATION, BUFFALO | : | |
| TECHNOLOGY (USA), INC., D-LINK | : | **JURY TRIAL DEMANDED** |
| SYSTEMS, INC., HITACHI DATA | : | |
| SYSTEMS CORPORATION, NETAPP, | : | |
| INC., NETGEAR INC., and QNAP, INC., | : | **PUBLIC VERSION** |
| | : | |
| Defendants. | : | |

**PLAINTIFF SUMMIT DATA SYSTEMS LLC'S
ANSWERING BRIEF IN OPPOSITION
TO DEFENDANT NETAPP, INC.'S
MOTION FOR ATTORNEYS' FEES AND COSTS**

PROCTOR HEYMAN, LLP
Neal C. Belgam (# 2721)
nbelgam@proctorheyman.com
Melissa N. Donimirski (# 4701)
mdonimirski@proctorheyman.com
300 Delaware Ave., Ste 200
Wilmington, DE 19801
(302) 472-7300

Attorneys for Plaintiff Summit Data Systems, LLC

OF COUNSEL:

MORRIS, MANNING & MARTIN, LLP
Bryan G. Harrison
bgh@mmmlaw.com
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326-1044
(404) 233-7000

Dated: February 19, 2013

# TABLE OF CONTENTS

I.     Nature and Stage of the Proceedings ................................................................................. 1

II.    Preliminary Statement........................................................................................................ 1

III.   Summary of Relevant Facts............................................................................................... 3

IV.    Argument ............................................................................................................................. 9

   A.    Netapp Has Not Established Its Entitlement to Attorneys' Fees. ........................................ 9

   B.    Summit Data's Claims Were Not Objectively Baseless .................................................... 11

      1.    Netapp Misapprehends Summit Data's Infringement Theories.................................... 11

      2.    Netapp's Assertion That All Accused Products Are Licensed Is Wrong...................... 12

      3.    Netapp's Claims That Summit Data Tried To Sneak Its Proposed Order Granting Dismissal By The Court Are Nonsensical................................................................... 13

   C.    Netapp's Assertions That This Is An Exceptional Case Are Fatally Flawed. .................. 14

      1.    Defendant Netapp's Arguments Regarding the RPX Agreement Do Not Render Summit Data's Claims Objectively Baseless. ............................................................. 14

      2.    Defendant Netapp's Arguments Regarding Its WAFL System, At Best, Create An Issue of Fact for the Jury. ......................................................................................... 15

      3.    Defendant Netapp's Arguments to Paint Summit Data's Settlement Agreements in this Litigation As "Nuisance Value" Are False. ............................................................... 16

V.     Conclusion ......................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Beckman Instruments, Inc., v. Produkter AB*, 892 F.2d 1547 (Fed.Cir.1989) ................................. 9

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005).................... 14

*Carborundum Co. v. Molten Metal Equipment Innovations, Inc.*, 72 F.3d 872 (Fed. Cir. 1995) 12

*Cybor Corp. v. FAS Techs.*, 138 F.3d 1448 (Fed.Cir.1998) (en banc) ............................................ 9

*Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805 (Fed.Cir.1990)................................. 9

*Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011) ............................................... 15

*Forest Labs., Inc. v. Abbot Labs.*, 339 F.3d 1324 (Fed.Cir.2003) .................................................. 11

*Haynes Int'l Inc. v. Jessop Steel Co.*, 8 F.3d 1573 (Fed.Cir.1993) ................................................ 14

*iLOR, LLC v. Google, Inc.*, 631 F.3d 1372 (Fed.Cir.2011) ........................................................... 14

*Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867 (Fed.Cir.1988) (en banc)10

*Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181 (D. Del. 2001)............. 12

*Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538 (Fed.Cir.1990) ........................................... 10

*Monsanto Co. v. Scruggs*, 459 F.3d 1328 (Fed. Cir. 2006) ........................................................... 12

*National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185 (Fed.Cir.1996)............................... 10

*Old Reliable Wholesale, Inc. v. Cornell Corp.*, 635 F.3d 539 (Fed.Cir.2011) .............................. 14

*Pfizer Inc. v. Teva Pharma USA, Inc.*, 820 F.Supp. 2d 751 (E.D. Va. 2011) ................................ 14

*Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578 (Fed.Cir.1985)............................. 10

*Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448 (Fed.Cir.1985)................................. 10

*Stevens Co. v. Lex Tex, Ltd.*, 822 F.2d 1047 (Fed.Cir.1987) ......................................................... 10

Pursuant to the Court's Order of Dismissal and Permission to File A Request for Costs and Attorneys' Fees [D.I. #235], Plaintiff Summit Data Systems LLC ("Summit Data") submits this Answering Brief in opposition to Defendant Netapp, Inc.'s Motion for Attorneys' Fees and Costs (the "Motion"), showing this Court as follows.

## I. NATURE AND STAGE OF THE PROCEEDINGS

This action has been dismissed by the Court, upon Summit Data's motion. [D.I. #228, # 235.] Netapp has contended that it is entitled to (i) an award of costs, (ii) a declaration that this case is exceptional and (iii) an award of attorneys' fees against Summit Data and Summit Data's parent entity, Acacia Research Group LLC. [D.I. #236.]

## II. PRELIMINARY STATEMENT

While the parties have agreed that this case should be dismissed with prejudice, Netapp claims that—for the reasons supporting its request to file summary judgment in its November 21 letter—Netapp should be awarded its fees as a condition of the dismissal. Netapp's request is without merit and should be denied.

As an initial matter, it appears that Netapp is more interested in litigating with Summit's ultimate parent entity, Acacia Research Corp., rather than the current dispute between Summit and Netapp. There is no factual basis in Netapp's Motion for its assertions that either Acacia Research Corp. or Acacia Research Group LLC is the alter-ego of Summit. Indeed, Netapp deposed Summit's 30(b)(6) witnesses extensively upon the corporate relationship between Summit, Acacia Research Group LLC, and Acacia Research Corp. but apparently found no basis for such allegations. Netapp's repeated reference to Summit Data as "Acacia" throughout its Motion is therefore inappropriate and no relief can be granted against non-party entities.

Defendant Netapp's Motion is filled with and based on numerous erroneous statements, including:

| Netapp's Representation | Evidence |
|---|---|
| Summit knew of the scope of the RPX Agreement prior to filing suit | There is no evidence that Summit knew or should have known of the scope of the RPX Agreement prior to filing suit and, in fact, the RPX Agreement contains terms that are inconsistent with the broad scope asserted by Netapp. Indeed, no party recognized the scope of the RPX Agreement until October 2012, six months after its production by Summit Data in this case. |
| The RPX Agreement extinguished Summit's infringement claims | License is an affirmative defense. Netapp's expert failed to identify a single dollar of revenue from its accused sales that would be subject to the RPX Agreement, despite having access to such information and Netapp's affirmative burden to do so. At best for Netapp, it appears that the RPX Agreement licensed approximately less than half the relevant sales. |
| Summit "hid" the RPX Agreement from Defendants | Summit Data produced the RPX Agreement, along with other relevant documents, as part of all parties' initial rolling productions between mid-March and mid-April 2012. In particular, Summit Data produced the RPX Agreement on April 3, 2012, less than a week after Netapp produced its first set of documents. |
| Summit's expert failed to identify any infringing systems | Because there were a large number of infringing systems and because NetApp produced its sales information by category, Summit's expert report identified infringing systems by category. The exemplary system identified in the expert report was licensed after the relevant testing had occurred and applied with equal force to unlicensed systems since it referenced an iSCSI standard agnostic to the operating system implementation. |
| Summit's claims of infringement fail by reason of Netapp's storage servers' use of a central file server | Summit's expert opined and testified that, in the accused configuration, Netapp's storage servers failed to *utilize* a central file server and that the mere presence of a central file server that could be used in other configurations did not constitute a "use" in the accused configuration. |
| Summit's claims were settled for nuisance value with other defendants | The settlements entered into between Summit and other defendants varied from ▮▮▮▮▮ of gross sales. |

2

Given the foregoing and as explained in detail below, Summit's litigation against Netapp is clearly not objectively baseless nor an exceptional case that would support the award of attorneys' fees to Netapp and the Motion should be denied.

## III.   SUMMARY OF RELEVANT FACTS

In this action, Summit Data accuses Netapp of infringement by, among other things, the selling of families of storage devices and instructing Netapp's customers through, at least, documentation accompanying such systems, in the configuration and use of Netapp's systems in a manner that infringes the patents-in-suit.   [D.I. #288, Exs. 19, 21, 22].   The products comprising these families are sold by Defendant Netapp in various configurations, including configurations for Microsoft, Linux, Unix, and AIX operating systems.   [D.I. #233-5].   The patents-in-suit are wholly agnostic, however, to these operating systems and the claim charts set forth in Summit Data's expert report, while showing infringement in an exemplary Microsoft host operating system, apply with equal force regardless of the operating system at issue—as long as the storage system utilizes multiple logical connections to communicate with its host computer.   [D.I. #288, Ex. 19].

In late 2009, Summit Data's predecessor-in-interest reviewed a patent portfolio including the patents-in-suit for potential acquisition.   [D.I. #288, Ex. 6].   As a part of its due diligence process, a consultant performed analysis and testing of a number of potential products to determine whether such products practiced one or more claims of the patents-in-suit.   The consultant thoroughly tested one product from Netapp, confirming that it practiced the asserted

3

claims. In particular, this testing established direct infringement of at least the asserted claims in this action by Netapp's products.[1]

In June 2010, Summit Data entered into the RPX Agreement. [D.I. #288, Ex. 7.] In the RPX Agreement, RPX and Summit Data agreed that, among other things, RPX could obtain a license and release of Netapp's infringing conduct for payment by RPX to Summit Data of ███████ if exercised before September 21, 2010, or ███████ if exercised before November 21, 2010. [D.I. #288, Ex. 7.][2] As can be ascertained from a review of these payments, neither RPX nor Summit Data believed that—as later appeared—any storage system utilizing a network with a Microsoft operating system would be licensed under the RPX Agreement.

In September 2010, Summit Data filed this action against Defendant Netapp, as well as EMC Corporation, Buffalo Technology (USA), Inc., D-Link Systems, Inc., Fujitsu America, Inc., Infortrend Corporation, Netgear, Inc. and Qnap, Inc. [D.I. #1]. Shortly thereafter, Fujitsu America, Inc. obtained a sublicense through the RPX Agreement—███████████████████ ████████████████████████—and Summit Data filed the requisite dismissal. [D.I. #66, D.I. #288, Ex. 8]. Similarly, Netgear, Inc. obtained a sublicense through the RPX Agreement in November 2011—████████████████████████████ █—and Summit Data filed the requisite dismissal. [D.I. #134, D.I. #288, Ex. 8].

On March 14, 2011, the Court issued an order dismissing Summit Data's First Amended Complaint without prejudice. [D.I. #76]. Summit Data filed its Second Amended Complaint a week later. [D.I. #79]. On March 29, 2011, the Court entered a scheduling order, setting, among other things, a claim construction briefing schedule in the fall of 2011 and a hearing date of

---

[1] Thereafter, Summit Data engaged in analyses that confirmed all accused products operated with respect to the asserted claims in substantially the same manner.

[2] The RPX Agreement provided for similar payments by EMC Corporation of ███████ and ███████, respectively.

4

February 15, 2012. [D.I. #78]. On April 25, the last defendant responded to the Second Amended Complaint. [D.I. #103].

Thereafter, the parties focused their attention on claim construction issues.

On January 11, 2012, Defendants served their first set of common requests for production of documents. [D.I. #140]. Summit Data timely responded to these requests on February 27, 2012. [D.I. #148].

On February 15, 2012, the Court held its claim construction hearing and on March 2 the parties submitted a chart of the remaining terms proposed for construction after their post-hearing negotiations. [D.I. #152]. During this period and shortly thereafter, Summit Data reached a settlement of its claims against Hitachi Data Systems, Inc., D-Link Systems, Inc., and Buffalo Technology (USA), Inc., filing the requisite dismissals. [D.I. #149, #288, Ex. 12, #151, #288, Ex. 13, Ex. #167, #288, Ex. 14]. Throughout February and March, the parties exchanged and responded to further initial discovery requests.

Specifically, on March 15, 2012, Defendant Netapp responded to Summit Data's interrogatory, requesting the basis for Netapp's affirmative defenses of license and exhaustion. In response, and subject to a litany of objections, Netapp responded, "NetApp's investigation is ongoing and NetApp *will supplement this interrogatory as additional information becomes available*." [D.I. #233-5 (emphasis added)].

On March 22, 2012, Summit Data produced an initial tranche of documents responsive to the Defendants' pending discovery requests. On March 28, 2012, Netapp produced its initial tranche of documents responsive to Summit Data's pending requests. On April 2, 2012, Summit Data produced additional documents to Defendants, including the RPX Agreement and documents relating to settlements prior to that time.

5

On April 12, Summit Data responded to Defendant Netapp's first interrogatories, providing detailed infringement contentions.

On April 25, 2012, this Court issued its claim construction Order, primarily adopting Summit Data's proposed constructions. [D.I. #189]. Netapp failed to supplement its discovery response regarding the bases for its affirmative defenses of license and exhaustion in April 2012, despite receiving the RPX Agreement earlier that month.

Thereafter, Summit Data and the remaining defendants continued to engage in liability discovery. Netapp failed to supplement its discovery response regarding the bases for its affirmative defenses of license and exhaustion in May 2012, despite engaging in substantive discovery dispute discussions regarding Netapp's other defenses to Summit Data's infringement claims.

On June 22, Netapp produced its first sales information for the accused product families—a five page summary of its sales for the period September 21, 2010, through April 27, 2012. [Shin Decl., Ex. A.] This summary identified total sales of the accused products of ████████████, of which ████████████ were attributable to sales of products utilizing the iSCSI protocol. [Shin Decl., Ex A, Ex. B at p. 20.]

In July 2012, Summit Data reached a settlement of its claims with Infortrend, Inc. and filed the requisite dismissal. [D.I. #208].

On July 26, 2012, fact discovery closed. Defendant Netapp did not supplement any discovery responses, including the request seeking the bases for its affirmative defenses of license and exhaustion during the fact discovery period.

In August 2012, Summit Data reached a settlement of its claims with Qnap, Inc. and filed the requisite dismissal. [D.I. #213].

6

In September 2012, Summit Data and Defendant Netapp exchanged their initial expert reports, including Summit Data's initial liability and damages reports. [D.I. #288, Ex. 19, Shin Decl., Ex. B.]

On October 5, 2012, Defendant Netapp sent an email to Summit Data, asking for clarification of its liability and damages expert reports in light of the RPX Agreement.[3] [D.I. #288, Ex. 9]. This email, coming approximately 6 months after the document had been produced and more than two months after the close of discovery, was the first occasion on which NetApp had raised the RPX license issue. In its email, Netapp recognized that not all of its products accused of infringement were licensed, stating

> Thus, the asserted patents are licensed to Microsoft *with respect to allegedly infringing product combinations using Microsoft software*. Summit's rights are therefore exhausted and impliedly licensed with respect to NetApp when third parties *employ systems utilizing Microsoft initiator software.*
>
> Accordingly, no product sold by NetApp can be used in an infringing manner *when the end user employs Microsoft's initiator software* because each end user's system is licensed through Microsoft's right to have its software used in allegedly infringing products.

[D.I. #288, Ex. 9 (emphasis added).]

Summit Data agreed to an extension of time for service of Defendant Netapp's expert reports. On October 10, 2012, Summit Data responded and confirmed that the RPX Agreement on its face appeared to license any storage server utilized with a Microsoft operating system. [D.I. #288, Ex. 9]. The agreement is facially ambiguous and in direct internal conflict in that it

---

[3] Prior to this email, Defendant Netapp still had not supplemented its interrogatory response regarding the bases for its assertions of the affirmative defenses of license and exhaustion based upon the RPX Agreement.

7

provides this seemingly broad license while also providing that RPX could obtain a sublicense for Defendant Netapp only in exchange for payments of over ▮▮▮▮▮▮▮.

On October 19, 2012, Defendant Netapp served its rebuttal expert report. [Shin Decl., Ex. C.] In his rebuttal report, Netapp's damages expert, Dr. Peter Hess, failed to identify a single dollar of Netapp's iSCSI sales of ▮▮▮▮▮▮ attributable to an entity licensed under the RPX Agreement. [Shin Decl., Ex. C.] Rather, Netapp's expert—despite undisputedly having access to detailed information from Netapp to determine the operating systems and hardware utilized by Netapp's storage servers reflected in their summary sales information and whether such systems were sold to a licensed entity—concluded without any analysis that:[4]



[Shin Decl., Ex. C,¶ 90.]

Without any identification by Netapp's expert of what sales Netapp contended were subject to the RPX Agreement upon which to rely, Summit Data's expert revised his opinions, explaining that the licensing of Microsoft resulted in a decrease of the royalty base by approximately fifty-percent (50%), relying upon industry surveys showing the percentage of storage systems utilizing a Microsoft operating system. [D.I. #288, Ex. 21.]

In analyzing the license provisions of the RPX Agreement in conjunction with Defendant Netapp's inquiry, Summit Data determined that the damages likely recoverable from Defendant Netapp and EMC Corporation were likely only slightly more than the costs and fees that Summit

---

[4]    Summit Data sought sales information for Defendant Netapp's accused products. Defendant Netapp agreed only to produce five pages of summary sales information and refused to produce additional information in response to requests by Summit Data.

Data would incur in taking the case through a jury trial and likely appeal and decided that the low rate of return simply did not economically justify moving forward through trial. Accordingly and only a few weeks after receipt of the initial email information regarding Netapp's license and exhaustion position based upon the RPX Agreement, Summit Data offered to resolve this case with Defendant Netapp and EMC Corporation by dismissing the case with prejudice. EMC Corporation agreed to dismiss its counterclaims with prejudice and accept the proposal. When Defendant Netapp refused, Summit Data moved to dismiss its claims.[5] [D.I. #228.] In response to Summit Data's motion, Defendant Netapp claimed that, among other things, Summit Data's inclusion of a proposed order granting dismissal "quietly inserted" the phrase, with each party to bear its own costs. [D.I. #229.]

## IV.    ARGUMENT

Defendant Netapp asserts that Summit Data's claims were objectively baseless and pursued by Summit Data in subjective bad faith. As explained more fully, below, Netapp's assertions are demonstrably false.

### A.    Netapp Has Not Established Its Entitlement to Attorneys' Fees.

The determination of whether to award attorney's fees under 35 U.S.C. § 285 (2012) is a two-step process. *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1460 (Fed.Cir.1998) (en banc). A district court must first make a factual determination that the case is exceptional. *Id.* Then the district court must exercise its discretion to decide whether an award of fees is appropriate. *Id.*

Initially, the prevailing party must establish, by clear and convincing evidence, that, under the totality of the circumstances, the case is exceptional. *Beckman Instruments, Inc., v. Produkter AB*, 892 F.2d 1547, 1551 (Fed.Cir.1989); *Eltech Systems Corp. v. PPG Industries,*

---

[5]    Dismissal of Summit Data's claims rendered Netapp's counterclaims moot, as such counterclaims sought only declaratory judgment relief with respect to the asserted patents. [D.I. #93.]

9

*Inc.*, 903 F.2d 805, 811 (Fed.Cir.1990). Factors that may be considered in a determination of exceptionality include "misconduct during litigation, vexatious or unjustified litigation, or a frivolous suit." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 455 (Fed.Cir.1985) (affirming district court's determination of non-infringement and invalidity and remanding for a determination of exceptionality).

However, a district court may, in its discretion, decline to award attorney's fees even if a case is found to be exceptional. *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed.Cir.1990) (affirming district court's denial of § 285 fees to prevailing patentee even though the jury found willful infringement and the case was found to be exceptional); *J.P. Stevens Co. v. Lex Tex, Ltd.*, 822 F.2d 1047, 1050–53 (Fed.Cir.1987) (affirming district court's denial of § 285 fees to prevailing accused infringer despite finding of exceptionality). In deciding whether or not to exercise discretion and award fees, a district court may consider "the closeness of the question, litigation behavior, and any other factors whereby fee shifting may serve as an instrument of justice." *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1197 (Fed.Cir.1996) (affirming district court's discretionary denial of attorney's fees despite jury's finding of willful infringement, which was sufficient to meet the "extraordinary case" criterion of § 285). Although the factors under consideration in the two steps of the § 285 analysis are similar, the steps nevertheless remain separate. *See Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1583 (Fed.Cir.1985) ("The issue of discretion comes into play, not in determining whether the case is exceptional, but in deciding, with respect to an exceptional case, whether the award of attorney fees was appropriate ...."), *overruled on other grounds by Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867 (Fed.Cir.1988) (en banc).

When the prevailing party is the accused infringer, attorney's fees will be awarded only where it is necessary to prevent a gross injustice to the accused infringer because the patent was procured in bad faith or the patentee litigated the infringement claim in bad faith. *Forest Labs., Inc. v. Abbot Labs.*, 339 F.3d 1324, 1329 (Fed.Cir.2003) (reversing district court's finding of exceptionality because the district court erred in finding that patentee engaged in bad faith litigation). Vexatious, unjustified or frivolous litigation constitutes bad faith. *Id.* at 1329–30.

B.    Summit Data's Claims Were Not Objectively Baseless

The bases for NetApp's attacks on Summit Data's claims are a series of erroneous premises.

1.    Netapp Misapprehends Summit Data's Infringement Theories.

Netapp's assertions regarding Summit Data's infringement theories are demonstrably false. As an initial matter, Netapp states that MCS (or MC/S) is Microsoft standard and, therefore, all accused products that utilize MCS are licensed. MCS, however, is a standard set forth in the iSCSI protocol (RFC 3720) that is wholly agnostic to the operating system implementation, not a Microsoft standard.[6] [D.I. #288, Ex. 19, pp. 6-11.]

Moreover, Netapp's claims that there are no infringing systems are beyond belief. Netapp publishes numerous documentation for non-Microsoft operating systems. [Shin Decl., Ex. .] Indeed, Snapdrive for Unix in 2007, shows iSCSI connections from a Unix host to a Netapp storage server utilizing multiple logical connections. [Shin Decl., Ex. .] Similarly, the Data

---

[6]    Netapp's statement that Summit Data "hid the factual testing evidence underlying its infringement contentions as privileged and withheld its theories generally until filing its expert reports" is erroneous. It is beyond dispute that Summit Data served its responses to Netapp's contention discovery in April 2012, setting forth the bases for Summit Data's infringement contentions, including detailed claim charts showing a Netapp storage server in use with a Microsoft host operating system. It was these same infringement contention charts that Summit Data's expert appended to his report in August.

11

ONTAP 7.3 Block Access Management Guide, referred to in Dr. Zimmerman's expert report,

shows support for Linux and other non-licensed operating systems.

    2.    <u>Netapp's Assertion That All Accused Products Are Licensed Is Wrong</u>

Netapp's assertions regarding the effect of the RPX Agreement are also demonstrably

false. In an email dated October 5, 2012, Netapp first identified the RPX Agreement as a basis

for Netapp's assertions that some of the accused products are licensed. [D.I. #288, Ex. 9.] In

that email, Netapp asserted:

> Accordingly, no product sold by NetApp can be used in an
> infringing manner *when the end user employs Microsoft's
> initiator software* because each end user's system is licensed
> through Microsoft's right to have its software used in allegedly
> infringing products. Summit's infringement contentions and
> current damages calculations *if they include NetApp's actions
> relating to the Microsoft technology* would thus constitute a
> breach of its license agreement with Microsoft and RPX.

[D.I. #288, Ex. 9 (emphasis added).] Thus, even Netapp concedes that not all accused products

are licensed, rather only products utilizing a Microsoft initiator are referenced in this email.

Summit Data, after reviewing the RPX Agreement, conceded that on its face, any Netapp

product utilizing a Microsoft iSCSI initiator would be licensed. This reading of the RPX

Agreement directly contradicted the sublicense fees for Defendant Netapp and others in the RPX

Agreement. In any event, Summit Data's infringement theories were not limited to those Netapp

products utilized in a Microsoft operating system environment, and the burden rested upon

Netapp to establish its affirmative defense of license on such other products. It is undisputed that

license and patent exhaustion are affirmative defenses for which Netapp bears the burden of

proof. *See, e.g., Monsanto Co. v. Scruggs,* 459 F.3d 1328, 1334 (Fed. Cir. 2006); *Carborundum

Co. v. Molten Metal Equipment Innovations, Inc.,* 72 F.3d, 872, 878 (Fed. Cir. 1995); *Lucent

Techs., Inc. v. Newbridge Networks Corp.,* 168 F. Supp. 2d 181, 240 (D. Del. 2001). To meet its

burden, Netapp is required to establish which of its products it sold to companies to whom a license has been granted in the RPX Agreement. *Id.* Netapp, however, apparently cannot meet this burden.[7]

Indeed, Netapp's expert, in his report, failed to identify a single dollar of Netapp's ███████████ in sales of the accused products that were licensed due to their use in a Microsoft operating system or by reason of any other entity licensed under the RPX Agreement. This failure is particularly telling given that Netapp not only had the burden to establish license but that its expert undoubtedly had—or should have had—access to the very information necessary to such an assertion.

Based upon this failure, Summit Data's expert rebuttal reports were forced to utilize market share information, which establishes that Microsoft operating systems account for less than fifty-percent (50%) of the accused market. [D.I. #288, Ex. 21, p. 7.]

### 3. Netapp's Claims That Summit Data Tried To Sneak Its Proposed Order Granting Dismissal By The Court Are Nonsensical.

In its Motion, Netapp claims that Summit Data "silently included an unsupported provision" in its proposed order submitted with its Motion to Dismiss. It's unclear to Summit Data how a provision in a proposed order appended as required by the Court's Local Rules on an *opposed* motion can be "silently included." The proposed order was just that—Summit Data's proposed order on its Motion to Dismiss. The assertion that Summit Data's counsel somehow tried to slip this by the Court is offensive and not supportable.

---

[7] Defendant Netapp misstates the deposition testimony of Summit Data's expert in several key respects. Most importantly, Summit Data's expert did not state that it was a "big mistake" to test Defendant Netapp's storage servers in a Microsoft operating system environment, but only agreed that he should have inquired whether other licenses potentially covering accused Netapp products existed. As noted earlier, however, the affirmative defense of license is Defendant Netapp's burden, not Summit Data's.

C.     Netapp's Assertions That This Is An Exceptional Case Are Fatally
       Flawed.

Defendant Netapp asserts that Summit Data asserted "fatally flawed infringement positions" in support of Netapp's claims that this case is exceptional. As shown below, it is Netapp's position, not Summit Data's litigation position, that is "fatally flawed."

As explained above, a court must first determine whether the prevailing party has demonstrated by clear and convincing evidence that the case is exceptional. Here, Defendant Netapp does not contend that litigation misconduct occurred and, therefore, must establish by clear and convincing evidence both that (i) the litigation was brought by Summit Data in subjective bad faith, and (ii) the litigation is objectively baseless. *Old Reliable Wholesale, Inc. v. Cornell Corp.,* 635 F.3d 539, 543–44 (Fed.Cir.2011) (quoting *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.,* 393 F.3d 1378, 1381 (Fed. Cir. 2005)). "Under this exacting standard, the [accused party's] case must have no objective foundation, and the [accused party] must actually know this." *iLOR, LLC v. Google, Inc.,* 631 F.3d 1372, 1377 (Fed.Cir.2011). Correspondingly, "[a] frivolous infringement suit is one which the patentee knew or, on reasonable investigation, should have known, was baseless." *Haynes Int'l Inc. v. Jessop Steel Co.,* 8 F.3d 1573, 1579 (Fed.Cir.1993); *see also Old Reliable Wholesale,* 635 F.3d at 544 (finding that for a claim to be objectively baseless, it must be "so unreasonable that no reasonable litigant could believe it would succeed" (quoting *iLOR,* 631 F.3d at 1377)). "Hard-fought litigation," without more, will not result in a level of misconduct permitting an award of fees. *Pfizer Inc. v. Teva Pharma USA, Inc.,* 820 F.Supp.2d 751, 756 (E.D. Va. 2011).

1.     Defendant Netapp's Arguments Regarding the RPX Agreement Do Not
       Render Summit Data's Claims Objectively Baseless.

As noted above, the RPX Agreement did not license the entirety of the accused products and, more importantly, Defendant Netapp failed to come forward with any evidence as to a

14

single dollar of its iSCSI sales of ████████ attributable to an entity licensed under the RPX Agreement. Conversely, Summit Data's expert opined, utilizing market data, that only approximately 47% of Defendant Netapp's accused products utilized a Microsoft host initiator.

Regardless, Defendant Netapp first raised the RPX Agreement issue on October 5, 2012, well after the close of discovery and six months after the document was produced by Summit Data . [D.I. #288, Ex. 9.] Approximately three weeks after Defendant Netapp first raised the RPX Agreement issue, Summit Data offered to dismiss its claims against Defendant Netapp, with prejudice.

### 2. Defendant Netapp's Arguments Regarding Its WAFL System, At Best, Create An Issue of Fact for the Jury.

Defendant Netapp asserts that its accused products do not meet the limitations of the patents-in-suit due to, among other things, the products' use of the WAFL file system. The WAFL file system, however, is composed of various levels. When configured to operate as a NAS (file-level storage server), the server's WAFL file system manages and satisfies requests for various files of data. [D.I. #233-5, pp. 46-50]. However, when configured to operate as a SAN (block-level file storage server), the server's WAFL system utilizes only its lower level that translates the iSCSI request into specific physical block locations. [D.I. #233-5, pp. 50-54.] This use of the lower level translator of the WAFL system does not constitute "use of a central file manager." [D.I. #233-5, pp. 50-54.]

At best for Netapp, a question of material fact exists with respect to whether Netapp NAS (block-level) storage servers use of the lower level translator of the WAFL system is use of a central file manager.

15

3.  **Defendant Netapp's Arguments to Paint Summit Data's Settlement Agreements in this Litigation As "Nuisance Value" Are False.**

Defendant Netapp's reliance upon *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011) is misplaced. In *Eon-Net*, the plaintiff filed numerous suits against a "plethora of defendants" that it then offered to settle for $25,000-$75,000. *Id.* at 1327.

Here, Summit Data filed suit against eight defendants and entered into settlements between ▇▇▇ and ▇▇▇ with the smaller defendants, with those agreements reflecting between ▇▇▇ and ▇% of accused product sales. Applying even the lowest percentage, based upon represented sales in those agreements, to 53% of Defendant Netapp's iSCSI sales of ▇▇▇▇▇ results in a settlement of over ▇▇▇.[8] Clearly, then this is not a case where Summit Data sought mere nuisance settlements to extort a large number of defendants relying upon baseless positions.

## V. CONCLUSION

Based upon the foregoing, Summit Data respectfully requests that the Court deny Defendant Netapp's Motion.[9]

Respectfully submitted,

*/s/ Neal C. Belgam*

Neal C. Belgam (# 2721)

---

[8]  Utilizing the median value of the settlement agreements would result in a settlement of over ▇▇▇.

[9]  In the event that the Court determines to award fees or costs for some portion of the proceedings, Summit Data respectfully requests the opportunity to confer with Netapp on any appointment and failing agreement to present the issue to the Court.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2015, I filed or caused to be filed

copies of the foregoing with the Clerk of the United States Court of Appeals for the

Federal Circuit via the CM/ECF system and served or caused to be served a copy

on all counsel of record by the CM/ECF system.


Dated: January 5, 2015                    */s/ Edward R. Reines*
                                          Edward R. Reines

                                          *Counsel for Defendant-Appellee*