**Appeal No. 2015-1103**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**SUMMIT DATA SYSTEMS LLC,**

*Plaintiff-Appellant*,

**v.**

**NETAPP, INC.,**

*Defendant-Appellee*.

**Appeal from the United States District Court for the District of Delaware, Case No. 1:10-CV-00749-GMS, Judge Gregory M. Sleet.**

# NON-CONFIDENTIAL BRIEF OF DEFENDANT-APPELLEE NETAPP, INC.

Edward R. Reines
Byron C. Beebe
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood City, CA 94065
(650) 802-3000

Douglas Luftman
Vice President, Innovations Services &
Chief Intellectual Property Counsel
NetApp, Inc.
495 East Java Drive
Sunnyvale, CA 94089

*Attorneys for Defendant-Appellee*

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee NetApp, Inc. certifies as follows:

1. The full name of every party or amicus represented by us is:

NetApp, Inc.

2. The name of the real party in interest represented by us is:

N/A

3. All parent corporations and any public companies that own 10 percent or more of the stock of the parties represented by us are:

None.

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:

Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell LLP;
Edward R. Reines, Byron C. Beebe, Anish Desai,
Weil Gotshal & Manges LLP;
Brian E. Farnan, Farnan LLP;
Michael R. Franzinger, Sidley LLP

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ........................................................ 1

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF ISSUES PRESENTED ........................................................ 3

STATEMENT OF THE CASE ........................................................ 3

A. Acacia Controls Summit And Staffs It With Licensing Specialists ........................................................ 3

B. Acacia, Through Summit, Licensed The Patents To 43 Companies ........................................................ 5

C. Summit's Vague Complaint Fundamentally Differed From The Allegations It Ultimately Pursued ........................................................ 6

D. The District Court Found This Case Exceptional ........................................................ 9

SUMMARY OF ARGUMENT ........................................................ 11

ARGUMENT ........................................................ 14

I. THE DISTRICT COURT PROPERLY EXCERISED ITS DISCRETION BY FINDING THIS AN EXCEPTIONAL CASE AND AWARDING ATTORNEY FEES ........................................................ 14

A. The District Court Properly Found This Case Exceptional ........................................................ 15

B. Summit's Challenge To The Amount Of The Fee Application Should Be Rejected ........................................................ 35

CONCLUSION ........................................................ 39

CERTIFICATE OF COMPLIANCE ........................................................ 40

Matter marked as confidential on pages 5 and 23 concerns terms in the RPX agreement not otherwise disclosed by the district court's decision. Matter marked as confidential on page 5 and 26 concerns settlement and license terms not otherwise disclosed by the district court decision.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amsted Industries Inc. v. Buckeye Steel Castings Co.*,
23 F.3d 374 (Fed. Cir. 1994)....................38

*Brilliant Optical Solutions LLC v. Comcast Cable Communications, LLC*,
2015 *U.S. Dist. LEXIS* 39260 (D. Colo. March 27, 2015)....................2

*Eon-Net LP v. Flagstar Bancorp*,
653 F.3d 1314 (Fed. Cir. 2011).................... 26, 28

*Golden Bridge Technology, Inc. v. Nokia, Inc.*,
527 F.3d 1318 (Fed. Cir. 2008)....................32

*Highmark Inc. v. Allcare Health Management*,
134 S. Ct. 1744 (2014)....................14

*Highway Equipment Co. v. Feco, Ltd.*,
469 F.3d 1027 (Fed. Cir. 2006).................... 33, 34

*L.E.A. Dynatech, Inc. v. Allina*,
49 F.3d 1527 (Fed. Cir. 1995).................... 32, 33

*Monolithic Power Systems v. O2 Micro Intern. Ltd.*,
726 F.3d 1359 (Fed. Cir. 2013)....................15

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
134 S. Ct. 1749 (2014).................... 14, 26

*Parallel Iron LLC v. NetApp Inc.*,
Civil Action No. 12-769-RGA (D. Del. Sept. 12, 2014).................... 34, 35

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006)....................32

**Statutes**

35 U.S.C. §285.................... 9, 11, 14

D. Del. L.R. 7.1.2(a).................... 37, 38

Fed. R. Civ. P. 41(a)(2)....................33

## STATEMENT OF RELATED CASES

NetApp, Inc. ("NetApp") is not aware of any related case.

## PRELIMINARY STATEMENT

The District Court properly exercised its discretion by finding this suit to be an exceptional case warranting the reimbursement of NetApp's attorney fees. Based on its first-hand supervision of the lengthy trial court proceedings, the District Court found this case exceptional because Summit's litigation of this matter was "reckless and wasteful." The District Court decided that the reimbursement of NetApp's attorney fees was warranted to deter future abusive litigation in view of the totality of circumstances.

Summit Data Systems LLC ("Summit"), an Acacia Research Corporation ("Acacia") litigation holding company, brought this case against a broad swath of the storage server industry. But just prior to filing suit it had ***already*** licensed the patents-in-suit via RPX to numerous companies that supplied the accused computer technology used with defendants' products. Summit seeks to justify this double-dipping attempt by arguing that the patent license it had drafted, negotiated and executed with RPX was somehow ambiguous and that it misunderstood what was licensed. Specifically, Summit claims that it did not realize that it had already licensed the Microsoft technology on which it based its infringement claim in this case.

This "mistake" argument is inconsistent with Summit's licensing expertise, particularly given that it is staffed by the same Acacia licensing specialists that had just negotiated the RPX license. It is also inconsistent with Summit's admission in the trial court and on appeal that "the RPX agreement *on its face* appeared to license *any* storage server utilized with a Microsoft operating system." Summit Appeal Brief at 12[1]; *see also* A2240 ("the RPX agreement on its face appeared to license any storage server utilized with a Microsoft operating system.").

Moreover, Summit's claim that this case stemmed from an isolated "mistake" in how it read its RPX license is inconsistent with a recent sanction order in which another Acacia subsidiary was also sanctioned for pursuing a patent infringement suit even though the accused activity was already licensed. *Brilliant Optical Solutions LLC v. Comcast Cable Communications, LLC*, 2015 *U.S. Dist. LEXIS* 39260 at *8 (D. Colo. March 27, 2015) ("Prosecution of an infringement claim in the face of such a license is objectively unreasonable.").

As the District Court found, at best, Acacia was careless in having Summit pursue this case notwithstanding the plain terms of the RPX license. Yet Summit collected numerous nuisance value settlements and, if NetApp had succumbed to offers of low dollar or walk-away settlements, Summit would actually have profited from this meritless and reckless litigation.

---

[1] Emphasis supplied unless otherwise stated.

After settling for nuisance value with several defendants, Summit dismissed its case against EMC with prejudice in return for an agreement not to seek attorney fees. In the face of NetApp's summary judgment request, Summit moved to dismiss its meritless case with prejudice, but only on the precondition that NetApp forfeit its right to seek attorney fees. Summit argues that such a motion displays its good faith. Preconditioning dismissal of a meritless case on the waiver of attorney fees in this circumstance is further evidence of the exceptional nature of this case, it does not excuse it.

The District Court has presided over hundreds, if not thousands of patent cases, but very rarely has found a case exceptional. It is well-positioned to recognize when an exceptional case reflects abusive litigation and how abusive litigants can evade responsibility, if not deterred. The District Court's attorney fees award should be affirmed.

## STATEMENT OF ISSUES PRESENTED

Did the District Court abuse its discretion by finding this case exceptional and ordering Summit to reimburse NetApp for its attorney fees?

## STATEMENT OF THE CASE

### A. Acacia Controls Summit And Staffs It With Licensing Specialists

Acacia is a publicly traded company that is in the business of monetizing and enforcing patents, with an emphasis on patent litigation. A1343; A1345

("patent licensing and enforcement often begins with the filing of patent enforcement litigation").

Acacia holds itself out as among the most sophisticated patent licensing organizations in existence. A1345 ("We are a leader in patent licensing and our operating subsidiaries have established a proven track record of licensing success…."). It had entered into over 1000 license agreements as of February 2012. A1345. Acacia employs "specialists" that are "trained and skilled" in licensing. A1348.

Acacia's business model is to create a subsidiary to enforce a related set of patents. A1343-45. Typically, the subsidiary does not have its own operations, but rather is run by Acacia employees out of its Newport Beach, California headquarters.

Here, Acacia created Summit to monetize the asserted patents shortly before this case was filed. A2338. Acacia, using a different controlled subsidiary, purchased the two patents-in-suit in late 2009 and then transferred them to Summit. A1343, A1457.

Acacia and Summit share the same officers and these officers negotiate its license agreements. A1325-28. When Acacia purchased and licensed the patents through Summit, the agreements were signed by Acacia's Chief Executive Officer Paul Ryan, his successor Dooyong Lee and, on one occasion, Acacia's Chief

Financial Officer, Clayton Haynes. A1458 (Patent Purchase), A1460 [REDACTED], A1477 (RPX), A1519 (Hitachi Data Systems), A1525 (D-Link), A1532 (Buffalo Technology), A1555 (QNAP), A1561 (Netgear).

In its public SEC filings, Acacia refers to its subsidiaries as "Acacia." A1428. For convenience, this brief generally uses the term "Summit," but it should be understood that Summit is merely a legal holding company for Acacia.

**B. Acacia, Through Summit, Licensed The Patents To 43 Companies**

Acacia, through Summit, licensed the patents-in-suit in one mass agreement to 43 major computer companies through an intermediary, RPX Corporation, collecting millions of dollars. A1462-1502. The plain terms of the RPX license ensure that every computer system that includes, for example, Microsoft, [REDACTED] technology is licensed – not to mention the products of 40 other major companies such as [REDACTED]. *Id.* Specifically, the agreement provides that when a product of any of the 43 RPX licensees is in a system practicing the asserted patents, the entire system is licensed. A1463 (definition of "Licensed Product and Service"). The RPX agreement was approved by Acacia's then-Chief Executive Officer Paul Ryan. A1477.


CONFIDENTIAL MATERIAL OMITTED

### C. Summit's Vague Complaint Fundamentally Differed From The Allegations It Ultimately Pursued

Shortly after entering into the RPX agreement, Summit brought suit against eight computer storage equipment makers, including NetApp in September 2010. The case against NetApp was flawed from the outset.

Summit initially alleged that NetApp's products alone infringed. A99-100 [¶¶ 40-43], A105 [¶¶ 83-88]. The complaint did not allege that any other company's products or technology were involved in the alleged infringement. *Id.* But, as explained further below, Summit's ultimate infringement theory required a ***combination*** of NetApp's products with Microsoft's products providing the multi-connection technology at the heart of its case.

Summit's complaint also alleged that "NetApp does *not* have a license or other authorization to practice the claims in either the '291 Patent or '581 Patent." A100 [¶ 43]. But, as explained further below, Summit later conceded before the District Court that it wrongly accused already-licensed NetApp products.

Because the District of Delaware has not enacted Patent Local Rules, NetApp served interrogatories to attempt to understand Summit's infringement theory in view of the vague allegations in its complaint. A1607-59. Summit objected to this request as premature because it was still investigating its infringement position and it maintained that the request was improperly made before expert reports were due; thus, it agreed to provide only "preliminary

information." A1610, A1655. Subject to this caveat, Summit provided only an exemplary claim chart for NetApp's FAS 250 storage server product – one of the many NetApp storage server products it ultimately accused. A1611-56.

Four months later, when Summit served its expert report opining that NetApp infringes, it identified the use of ***only*** Microsoft's multiple connections (MCS) technology as an infringement. A1573; A2209 ("Q. [Y]our initial report, your August report in this case identified only one implementation of – of a NetApp system with multiple connections, and that was Microsoft, correct? A . Correct."). Summit's expert admitted that the "multiple connections" feature of the invention was "absolutely crucial." A1674 [71:17-20].

After reviewing Summit's expert report, NetApp requested that Summit withdraw its Microsoft-based infringement allegation because of the RPX license. A1503-04. Summit responded that it agreed the accused Microsoft technology was licensed and promised to address that problem in a reply infringement report. *Id*.

In its reply report, Summit acknowledged that the Microsoft technology is licensed and withdrew that allegation. A1604-05. It addressed the issue of its failure to identify an infringing system in only six sentences. *Id.* Although those few sentences vaguely made reference to other technologies that might be used with NetApp's products, the reply report did ***not*** purport to demonstrate that anything other than the already licensed Microsoft technology infringed in

combination with NetApp's products. *Id.* It merely opined on the relative market-share of multiple connection technologies. *Id.* Summit's expert failed to explain how the "absolutely crucial" multiple connections claim requirement was met by any unlicensed product. A1674 [71:17-72:2].

Summit's expert explained that he did not include an opinion of infringement beyond his withdrawn Microsoft infringement opinion because the "initial report was focused on the Microsoft example and Microsoft host operating system" and in reply he did not replace his Microsoft opinion because he claimed he "didn't have time" to perform the analysis. A1684-85 [103:21-104:2], A1688 [110:7-15]. Even though its expert claimed that he ran out of time, Summit did ***not*** seek additional time for its reply report. Nor has it ever explained why the normal amount of time for preparing its reply report was insufficient.

Summit's appeal brief states that its expert stood by an assertion of infringement in deposition after he realized that Microsoft was licensed, directing the Court to three pages of deposition testimony at A1686-88. Summit Appeal Brief at 13. Precisely to the contrary, the identified testimony establishes that Summit's expert did ***not*** include an infringement opinion beyond the already-licensed Microsoft technology because he claims he "did not have time." A1686-89.

Because Summit only accused the licensed Microsoft technology of infringement, and because NetApp could not infringe for other reasons, NetApp sought summary judgment of non-infringement promptly after expert discovery was completed. A824-27. Rather than respond on the due date, Summit sought to dismiss its case with prejudice but only on the condition that NetApp forfeit its right to seek reimbursement for its attorney fees. A933. Despite being a sophisticated licensing entity having successfully monetized millions of dollars in royalties, Summit asserted that the breadth of the RPX license was a "mutual mistake." A945 ("this broad scope was a mistake"). The District Court rejected Summit's explanation, granted NetApp's request to dismiss the case with prejudice, and allowed NetApp to apply for attorney fees. A1066-67.

**D. The District Court Found This Case Exceptional**

Because Summit attempted to dismiss this meritless case only after NetApp spent a lot of money and expended significant corporate resources, NetApp sought to recover its fees under 35 U.S.C. §285. A1072-96. NetApp explained that Summit's excuse for filing a meritless case – that Summit's incorrect interpretation of its own license with RPX was a mistake – was implausible. A1077-78. NetApp substantiated its application to recover attorney fees with full documentation.

In response, Summit admitted that "on its face" the RPX agreement licensed "any storage server utilized with a Microsoft operating system." A2240. But

Summit argued that it did not realize the breadth of the license that it had drafted, negotiated, and executed with RPX just prior to bringing this suit. A2240-41. It also argued that its infringement case was not limited to the licensed Microsoft system despite failing to show any other infringing products beyond an unsupported after-the-fact general reference to Linux or UNIX software. Instead of identifying expert support for this new position to try to show it actually had a viable infringement theory, Summit, consistent with its cavalier behavior during the entire course of this suit, merely submitted a paralegal's declaration. This declaration included previously unproduced printouts from a public website regarding Linux software and from NetApp's public web site regarding a never before accused NetApp product, called SnapDrive. This paralegal declaration with unproduced general web site references and no expert support was used to supposedly show NetApp's infringement. A2486-87. Summit did not challenge the fee amount; instead, it presumed it would be given a later opportunity to do so. A2249 at n.9.

Based on the totality of the circumstances, the District Court granted NetApp's motion. A1-9. It found the case exceptional based on both the fact that Summit brought suit for already licensed activity and Summit's overall approach to this litigation. *Id.*

## SUMMARY OF ARGUMENT

The District Court properly exercised its discretion in finding this an exceptional case under §285 based on Summit's reckless allegations against NetApp. Summit alleged that NetApp's products infringed when they were used with Microsoft's MCS technology, but later admitted that its RPX agreement plainly licensed that very same technology.

Summit has never presented a plausible story to explain its behavior, much less supporting evidence from those that decided to pursue this case notwithstanding the plain terms of the RPX license. Instead, Summit continues its unreasonableness by attacking the District Court's decision with an assortment of weak arguments and by ignoring the deferential standard of review.

Summit's lead argument is that the District Court committed legal error by failing to recognize that Summit had a viable infringement claim based on the combination of NetApp's storage server with Unix or Linux software. Given this, Summit contends it did not act recklessly in accusing the already-licensed Microsoft technology. This position ignores the square admission by Summit's expert that he "couldn't put in an opinion on UNIX or Linux that had the evidentiary support" because he "didn't have time." A1688 [110:7-15]. Summit's submission of previously unproduced public website pages about an unaccused product in response to NetApp's fee motion (and even more web links to putative

evidence on appeal), coming after having already had its suit against NetApp dismissed, was much too little, much too late.

The District Court found that Summit had no good excuse for recklessly bringing this suit, particularly given its licensing expertise and its admission that, on its face, the RPX license plainly establishes NetApp's license defense for the Microsoft MCS technology. Summit now argues that the RPX license is ambiguous; that a mistake was made. This argument is spurious. The RPX license plainly covers the NetApp storage servers when used with the accused Microsoft MCS technology – Summit has itself admitted that. Moreover, Summit did not present any evidence that it ***actually*** misunderstood the license, demonstrating its argument is merely a hypothetical, and thus irrelevant, scenario.

The District Court further found that Summit's pursuit of nuisance value settlements and ultimate willingness to dismiss its claims in exchange for a waiver of fees demonstrated a motive "to extract quick settlements that were dwarfed by the costs to litigate." A9. Summit contends that this finding is legal error because the settlements were for commercially competitive royalty rates. But to calculate these rates, Summit cites only unsupported attorney argument that is dubious at its core because it fails to account for many years of licensed future sales for which there are no forecasts in the record. The patents-in-suit do not expire until 2020. The District Court properly considered Summit's practice of seeking nuisance

value settlements when it evaluated the totality of the circumstances and found this case exceptional.

Summit also argues that the District Court committed a legal error by failing to credit it with good faith conduct in "voluntarily" dismissing this case when it recognized that it had accused licensed technology. Summit however did ***not*** voluntarily dismiss this case. Rather, only after Summit's back was against the wall facing a summary judgment request did it seek to dismiss its claims on the precondition that NetApp forfeit its right to seek fees. The District Court ***rejected*** this request and dismissed this case with prejudice, expressly permitting NetApp to file a fee application. Simply put, Summit's attempt to extinguish NetApp's right to seek fees as it attempted to try to wiggle out of this case was not a "voluntary" dismissal.

Summit's ultimate attempt to shift blame in this matter to NetApp, by claiming NetApp delayed in raising its license defense, fails. Summit acted recklessly in pursuing a meritless claim and it bears responsibility for its actions. In any event, Summit objected to providing its infringement positions concretely until its expert report. Upon receipt of that report, NetApp promptly informed Summit that it was accusing already-licensed technology.

Finally, Summit complains for the first time on appeal about the amount of the fee award, citing new evidence. These arguments were not made in the District

Court. Summit had a fair opportunity to challenge the amount of the fee award before the District Court. Having failed to do so, its arguments have been waived.

The District Court's decision should be affirmed.

## ARGUMENT

### I. THE DISTRICT COURT PROPERLY EXCERISED ITS DISCRETION BY FINDING THIS AN EXCEPTIONAL CASE AND AWARDING ATTORNEY FEES

"Because § 285 commits the determination whether a case is 'exceptional' to the discretion of the district court, that decision is to be reviewed on appeal for abuse of discretion." *Highmark Inc. v. Allcare Health Management*, 134 S. Ct. 1744, 1748 (2014) ("an appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's § 285 determination.").

"District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). An "exceptional" case "is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id*.

Deference to a District Court's discretion in finding a case exceptional and awarding fees has strong roots in this Court's jurisprudence. *See, e.g., Monolithic*

*Power Systems v. O2 Micro Intern. Ltd.*, 726 F.3d 1359, 1368 (Fed. Cir. 2013). As this Court stated in *Monolithic*, "it ill behooves an appellate court to overrule a trial judge concerning litigation misconduct when the litigation occurred in front of the trial judge, not the appellate court." *Id*.

As established below, the District Court did not abuse its discretion either in finding this case to be exceptional or in its award of attorney fees.

**A. The District Court Properly Found This Case Exceptional**

Summit makes six arguments that the District Court abused its discretion in finding this case exceptional. Summit argues that the District Court committed legal error by:

(1) finding Summit presented no viable infringement claim

(2) finding Summit should have known the accused systems were licensed

(3) finding Summit had a pattern of seeking nuisance settlements

(4) failing to consider Summit's alleged good faith

(5) not blaming NetApp for Summit's pursuit of a meritless case, and

(6) accepting Summit's concession that NetApp is the prevailing party.

Each argument is addressed in turn.

**1. Summit Did Not Present A Viable Infringement Claim**

Summit has never set forth a viable infringement theory with even a minimum of evidentiary support. Summit based its patent infringement case on

NetApp's storage servers using Microsoft's implementation of its multiple connection technology ("MCS"). In awarding fees, the District Court properly found that Summit's "theory of infringement against NetApp for a system employing the Microsoft software" was meritless. A6. Summit ultimately also admitted that its infringement theory based on the Microsoft technology was meritless – by all accounts that technology was already licensed. Summit Appeal Brief at 12 ("the RPX agreement on its face appeared to license any storage server utilized with a Microsoft operating system."). Indeed, Summit's expert expressly "withdrew" his opinion that the Microsoft implementation infringed when he learned of the RPX license. A1678 [85:9-17].

Summit opposed NetApp's fee motion in the District Court by arguing that, while having abandoned its Microsoft infringement theory because of the RPX license, it supposedly had other viable infringement theories, which were based on Linux and/or UNIX software. A6. The District Court rejected Summit's argument because "Summit's expert testified that he was unable to determine whether NetApp products in systems running Linux or UNIX, instead of Microsoft, would infringe the asserted patents because he 'didn't have time.'" *Id.*

Central to its appeal, Summit attacks the District Court's finding that Summit failed to present any viable infringement theory based on Linux or UNIX software. Summit's broadest contention is that its infringement theory

encompassed the industry standard iSCSI specification and thus always had a "standards based scope," relying on its opening infringement report. Summit Appeal Brief at 21 ("Dr. Zimmeran referred repeatedly to the iSCSI standards.").

Summits' standards argument fails because Summit's expert conceded directly that using iSCSI does ***not*** mean that the particular multiple connection feature of the patents is used:

> Q. Multiple connections, that's one – that's an absolutely crucial claim requirement for the patents-in-suit, right?
>
> A. That is correct.
>
> ***
>
> Q. [A]nd you understand that just using iSCSI alone doesn't mean that there's necessarily multiple concurrent logical connections, right? That's your point?
>
> A. That's correct.

A1674 [71:17-20], A1666 [27:20-24].

In any event, Summit's expert admitted that his infringement report only identified the licensed Microsoft MCS implementation of NetApp's storage server as an infringement, and no other implementation of NetApp's products:

> Q. [Y]our initial report, your August report in this case identified only one implementation of – of a NetApp system with multiple connections, and that was Microsoft, correct?
>
> A. Correct.
>
> Q. And you withdrew that in your reply declaration, correct?

A. That's correct.

A1678 [85:9-17].

In the face of its expert's explicit admissions, Summit argues on appeal that NetApp did "not dispute that a Linux- or UNIX-based 'initiator' using multipath technology (e.g., MIPO) would function the same way [as Microsoft's technology] with regard to the 'host computer' limitation." Summit Appeal Brief at 22. This statement is wrong. NetApp has firmly denied throughout this suit that there was ever a plausible infringement claim presented based on Linux or UNIX software. This argument also fails because it attempts to shift the burden to disprove infringement to NetApp through a comparison of technologies that have not even been meaningfully described by Summit. Simply put, Summit ***never*** submitted evidence attempting to show infringement based on Linux or UNIX implementations that would fall within the claims.

Given that its expert presented no plausible infringement claim during the case, Summit logically had the burden on the fees motion of going forward to explain why its suit was not meritless. It would make no sense to require NetApp to negate belated, potential infringement theories that had never been introduced before judgment was entered in its reply on a fees motion.

As NetApp explained below, Summit's expert admitted that he presented ***no*** evidence of Linux or UNIX infringement in his reports:

Q. How come you did not include any actual evidence that UNIX or Linux have multiple connections capability in your reports in this case?

A. My initial report was focused on the Microsoft example and Microsoft host operating system and that's why – that's why my report references that.

***

Q. And then the reason why you couldn't put in an opinion on UNIX or Linux that had the evidentiary support in your reply was it came up at the last minute and you just didn't have time? I think that's what you said.

A. Yeah, I did – I did not perform that analysis.

Q. And that's because you didn't have time?

A. It was – yeah. I didn't have time.

A865-66 [103:21-104:1], A1688 [110:7-15].

Because Summit had no evidentiary support for an allegation that Linux or UNIX software infringes in the context of a NetApp system, in response to NetApp's fees motion it attempted to backfill. As part of its fees opposition, after judgment had been entered against it, rather than submitting evidence from its expert, it submitted a paralegal's declaration attaching print-outs from a public on-line Linux resource and NetApp's website. A2486-87. These hasty internet printouts were not produced during the case and did not coherently establish anything relevant.

Summit attempted to rely on the website printouts to introduce an infringement theory based on Linux or UNIX after the case had already been dismissed. This maneuver failed because it was ill-conceived on multiple levels. On the substance, the newly submitted web pages are irrelevant to this case because they relate to NetApp's Snapdrive software product, which was never an accused product and was never mentioned in Summit's expert reports. Moreover, Summit has never attempted to explain how the print outs show infringement of a claim or even the concurrent use of multiple logical connections, which its own expert describes as an "absolutely crucial" claim requirement. A1674 [71:17-20]. That Summit felt compelled to attempt this ill-conceived gambit to try to avoid a fee award speaks volumes.

On appeal, Summit attempts to introduce more raw evidence belatedly. Summit Appeal Brief at 14 n.2, 15 n.3. Not only is this far too late, but it is completely undeveloped. There is no comparison to claim requirements, no identification of equipment actually configured, and no identification of what information on these websites Summit believes establishes infringement.

Finally, to try to show that it had evidence of a viable infringement theory, Summit identifies its expert's deposition testimony on pages A2217-18. These pages show the contrary. Summit's expert failed to identify any infringing, non-licensed system in this testimony:

Q. All your analysis, with all the discovery that you get in a federal case, anything on the internet, you've never been able to find one system in NetApp that is an infringing system?

A. I have not done that analysis.

Q. Did you think that that was an important thing to do if you were going to allege infringement in your opinions?

A. I looked at it from the – when I wrote the original report, I looked at it from the Microsoft view, and the – the analysis was based on that.

A2218-19 [109:20-110:6]. Although Summit's expert submitted multiple reports and was deposed at length, even the testimony relied upon by Summit squarely supports the District Court's finding that it had no viable evidence of infringement.

In sum, Summit has never presented evidence that it had a viable infringement theory either before or after judgment, or in its appeal brief.

**2. Summit's Argument That Its RPX License Is Ambiguous Should Be Rejected**

Summit's case was based on its Microsoft infringement theory, as demonstrated above. But Microsoft was licensed under the RPX agreement. To attempt to excuse the fact that it caused the District Court and NetApp to wastefully spend substantial time and effort litigating an infringement case against already licensed technology, Summit contends that the RPX license is ambiguous.

The District Court rejected this argument. A7. Given that the Acacia licensing experts that staff Summit are so sophisticated in patent licensing and

litigation, the District Court found that the most that could be argued is that Summit was careless. *Id.*

Summit does not contend that it misread the RPX license and actually believed that the Microsoft MCS technology was somehow unlicensed when used with NetApp's products. Indeed, when faced with NetApp's fee application, Summit did not submit any proof that it somehow misunderstood the RPX license. Its potential witnesses on this key question – the senior officials of Acacia who had signed the agreement and authorized this litigation – were silent. And given the sophistication of the Acacia patent licensing machine, it is not surprising that its licensing specialists did not claim that they had made such a careless mistake. This is telling and alone dispels Summit's challenge to the District Court's finding of culpability.

In place of evidence of a good faith mistake as to the meaning of the RPX license, Summit argues more technically that there could have been "a reasonable inference, on the face of the agreement, that NetApp did not have rights through the agreement." Summit Appeal Brief at 27.

Summit's technical "ambiguity" argument is off-base. As an initial matter, this argument is inconsistent with Summit's prior positions. In its appeal brief, Summit acknowledged that "the RPX agreement on its face appeared to license any storage server utilized with a Microsoft operating system." Summit Appeal

Brief at 12. It also acknowledged this in its opposition to the fee application. A2240 ("the RPX agreement on its face appeared to license any storage server utilized with a Microsoft operating system."). Its conflicting position should be rejected out of hand, but fails on the merits in any event.

Summit's lead argument on ambiguity relies on the fact that the RPX license provided that RPX had an option for an additional royalty payment to extend a license directly to NetApp that is independent of the Microsoft license. Importantly, Summit does not – nor could it – challenge that the Microsoft license provisions themselves plainly cover the NetApp products as accused of infringement in Summit's expert report. A1463 [redacted] Recall that Summit's expert relied on the Microsoft MCS technology to satisfy a claim requirement he agreed was "absolutely crucial" to the invention.

Nothing about RPX reserving the ability to license NetApp independent of the Microsoft license can change the undeniable fact that the broad license to

Microsoft covers NetApp's products when they are used with Microsoft technology. Notably, none of Acacia's licensing specialists defend this position.

Moreover, Summit's logic is flawed. There are all kinds of reasons why, notwithstanding the indirect rights NetApp received via the Microsoft license, RPX and NetApp might conceivably want to license directly in the future the whole portfolio of dozens of patents that are part of the RPX license. One example is if NetApp later introduces new otherwise infringing technology that does not involve existing RPX licensees. Another example is if NetApp planned to use one of the dozens of other patents included in the RPX license that do not involve third party technology at all. *See* A1478-81 (listing patents included in RPX license).

Summit next argues that the Microsoft license was not so obvious because of a "condition subsequent." It contends that, while RPX as a middleman had negotiated a right to a free license for all its members, the agreement does not state that RPX actually conveyed to its members the licenses it acquired for them. This is a make-weight, after-the-fact argument that was not even presented to the District Court. It is tardy now. It is also inconsistent with Summit's unqualified concession during expert discovery that the accused products were licensed because of the RPX license – ***without*** even asking whether RPX had withheld the free license from Microsoft. It is also inconsistent with Summit's admission that the RPX license "on its face" established a license to Microsoft. Acacia's

licensing experts could easily have confirmed with its licensing partner RPX that Microsoft had received its license if it had any genuine doubt.

In sum, Summit's insistence that its RPX agreement is ambiguous and did not clearly license the accused systems is flatly inconsistent with its admissions and its failure to submit evidence from its licensing specialists that it was somehow mistaken in its analysis of its RPX license.

### 3. Summit Engaged In A Nuisance Value Settlement Strategy

After licensing the computer industry to the patents-in-suit in the RPX license, including Microsoft's MCS technology, Summit attempted to double-dip by filing suit against the storage server industry for supporting that already-licensed computer technology. After filing its suit, Summit collected nuisance settlements from the storage server companies one-by-one. Summit has not shown that it ever had legitimate claims against any storage server company that was not covered by the RPX license.

Although it did not find it critical to its decision, the District Court found that "Summit's practice of extracting settlements worth a fraction of what the case would cost to litigate supports a finding of exceptionality." A7. The District Court explained that the highest settlement was for $175,000, a small fraction of what the case would cost to litigate. A7-9. Summit does not deny this finding. The Court

also observed that when parties refused to pay anything (NetApp and EMC), Summit essentially abandoned its claims. A7-8. Summit does not deny this either.

The District Court explained that, standing alone, the fact that a litigant accepts less than cost of defense settlements and abandons meritless claims when faced with summary judgment does not make a case exceptional. A8. But the Court noted that Summit accepted a substantial fee from RPX to license virtually the entire computer industry and then only months later sued the storage server industry that would naturally be licensed by virtue of the RPX license. A8-9. Based on these facts and its overall managing of this litigation, the Court found that "Summit's motivation was to extract quick settlements that were dwarfed by the costs to litigate." A9. In the end, the District Court found, based on all the circumstances, that a fee award was appropriate to deter "this sort of reckless and wasteful" litigation. A9. As legal support, the District Court identified the factors in *Octane Fitness* and this Court's decision in *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011).

To counter the District Court's findings, Summit argues that the District Court did not cite any evidence to counter Summit's self-serving argument that the lump sum low-dollar settlements represented an effective royalty rate from [redacted] [redacted] Summit Appeal Brief at 30. However, because Summit did not cite ***evidence*** to support its attorneys' conclusory translation of its lump-sum

settlements to royalty rates, that position carries no weight and the District Court obviously need not cite counter-evidence.[2] *See* A2249 (Summit's opposition to fee application with only attorney argument). Even if there were reliable figures for each defendant's historical sales for the relevant products, there is no reliable basis for a royalty rate translation because the patents do not expire until 2020. There are no reliable sales projections in the record for future sales through 2020. Moreover, because of the broad footprint of the RPX license, it is unclear what products there would be upon which to allocate the lump sum settlements for a royalty rate translation. Ironically, Summit attempts to excuse its dismissal of this case in the face of NetApp's summary judgment request by arguing that its "small" potential recovery of $600,000 did not "justify" litigation of the claim. If so, it cannot deny that its offers of settlement well below $200,000 to the other defendants could not have justified their further litigation on an economic basis. The other defendants' settlements are explained by the low amount of Summit's offers relative to the cost of further litigation, not because the settlement amounts bore a relationship with some accounting of a real-world, meaningful royalty rate.

---

[2] Summit attempts to submit new evidence on appeal on the royalty issue by way of identifying web pages. Summit Appeal Brief at 17 n.5. This is belated and an improper attempt to expand the record. It is also irrelevant.

Summit attempts to distinguish *Eon-Net* because that case involved a meritless infringement claim and this one supposedly does not.[3] As confirmed in Section I.A.1, above, the District Court correctly found Summit's infringement claim was meritless. Even during the fees stage, Summit failed to show that it had a meritorious claim against any of the defendants. This is no distinction at all.

Summit also tries to distinguish *Eon-Net* because that case involved litigation settlements with many more defendants. This is a distinction without a difference. Summit collected hundreds of thousands of dollars from six different defendants based on patents for which it had already received millions in royalties and has failed to show it had any meritorious claim. The system should not tolerate this misconduct.

**4. Summit's Claim Of Good Faith Is Unsupported**

Summit contends that the District Court abused its discretion by failing to find its conduct evidenced good faith. Summit Appeal Brief at 34 ("Parties should be praised, not punished…"). It alleges that it dismissed this case voluntarily and in good faith.

Yet, the evidentiary record belies Summit's good faith contention across the board. Summit failed to present any evidence to the District Court from its

[3] Via footnote, Summit asks this Court to reverse *Eon-Net en banc.* Summit Appeal Brief at 33 n.9. Not only is it improper to seek such relief in that way, Summit's argument is completely undeveloped. It does not explain the putative *en banc* question or what precedent there is for overruling it.

decision makers that it acted in good faith. It did not submit a declaration explaining why Summit pursued this case notwithstanding the RPX license, why it alleged in the complaint that the NetApp's accused activity was not licensed or otherwise authorized, why it settled for nuisance value with the other defendants or why it refused to dismiss this case without unjustified preconditions.

Summit's dismissal of this case was hardly a magnanimous gesture designed to relieve the District Court and NetApp of economically irrational litigation. Summit maintained its case against NetApp until the day Summit's response to NetApp's summary judgment request was due.[4] It submitted ***nothing*** in response to NetApp's summary judgment request because it had nothing plausible to submit. It was going to lose on summary judgment – as highlighted by its expert's crystal clear admissions documented above.

Instead of conceding summary judgment as the record required, Summit submitted a motion to dismiss its claim against NetApp but with the unjustified precondition that NetApp's statutory right to seek costs and attorney fees would be summarily extinguished.

---

[4] Summit originally sought money from NetApp to settle. After it realized it had no case and that NetApp would not pay money, Summit offered to dismiss its claims, but always on the condition that NetApp waive its right to seek attorney fees. A946. NetApp concluded that it deserved to be reimbursed for its fees and thus refused to accept Summit's demand. Summit had no basis to refuse to dismiss the case or to include preconditions because it had no basis for continuing to pursue its meritless claims.

The District Court rejected Summit's motion and ordered the case dismissed over Summit's objection to preserving NetApp's right to seek fees. A1066-67. Summit did not willingly dismiss its claims – it was attempting improperly to extinguish NetApp's right to seek fees and that request was rejected. The District Court did not abuse its discretion in refusing to credit Summit's supposed good faith.

#### 5. Summit's Pursuit Of A Meritless Case Was Not NetApp's Fault

Summit attempts to shift the blame for the pursuit of its meritless case to NetApp. Summit contends that NetApp took too long to challenge Summit regarding the RPX license. The District Court that presided over the to-and-fro in the discovery process, and who knows the practices in the Delaware courts on discovery contentions and motion practice, in exercising its discretion, rejected this argument. The following discussion explains why that was a good decision and certainly a valid exercise of discretion.

This case was brought in September 2010 and dismissed in January 2013. Prior to April 2012 NetApp had not received the RPX agreement, much less reviewed it. The alleged period of delay was from April 2012 when NetApp first received the RPX license until October 2012 – less than six months. But the central fault with Summit's argument is that it assumes that NetApp knew what Summit's infringement theories would be before it received its expert report and

was culpable for waiting until then. When Summit first provided "preliminary" infringement information in response to NetApp's interrogatory request in April 2012, it stated that its infringement investigation was continuing because the fact discovery period was on-going. A1609–10. Summit pointedly objected that the infringement interrogatories improperly sought expert opinions before the expert discovery period. A1610.

Summit, having objected to providing anything more than vague and preliminary infringement information before it completed fact discovery and served its expert report, can hardly be heard to complain that NetApp did not challenge that position through the expense and time of discovery motion practice – which would likely have consumed much of the six month period at issue. Summit's expert report was due only four months after the interrogatory response was provided.

Summit's attempt to blame NetApp was rejected by the District Court in a valid and sensible exercise of discretion and should be rejected now.

#### 6. The District Court Did Not Err By Accepting Summit's Concession That NetApp Is The Prevailing Party

Summit conceded that NetApp was the "prevailing party" in the District Court. Summit Appeal Brief at 35 n. 10 ("Summit initially conceded 'prevailing party' status"). In a footnote Summit now argues that NetApp is not the prevailing

party and that this is an "additional ground for reversal." *Id.* Summit has waived this argument both in the District Court and in this Court.

Summit's failure to raise the prevailing party issue before the District Court is a waiver that prevents it from being considered on appeal because "precedent generally counsels against entertaining arguments not presented to the district court." *Golden Bridge Technology, Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008).

Because this argument is only raised in a footnote in Summit's appeal brief, it also is not preserved as a matter of appellate waiver. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("arguments raised in footnotes are not preserved").

This is not an exceptional situation that overpowers time-tested waiver rules. Although the argument is undeveloped, Summit relies upon *L.E.A. Dynatech, Inc. v. Allina*, 49 F.3d 1527, 1531 (Fed. Cir. 1995) to argue that this is an exceptional situation excusing its waiver before the District Court. In *L.E.A.*, this Court set forth a four-prong test to establish an exception to the rule that arguments not presented in the district court are not considered on appeal:

> An appellate court will consider an issue not presented below only if: (i) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice; (ii) the proper resolution is beyond any doubt; (iii) the appellant had no opportunity to raise the objection at the district court level; (iv) the issue presents "significant

> questions of general impact or of great public concern[;]" or (v) the interest of substantial justice is at stake.

*Id.* at 1531 (citations omitted).

A particularly important requirement to prove an exception to the general rule of waiver is whether the issue waived in the District Court can be resolved beyond any doubt. *Id.* Summit cannot meet this standard. The "prevailing party" issue in this case is governed by *Highway Equipment Co. v. Feco, Ltd.*, 469 F.3d 1027 (Fed. Cir. 2006). In *Highway Equipment,* this Court held that, where the patentee granted a covenant not to sue to the accused infringer and the case was accordingly dismissed with prejudice under Federal Rule of Civil Procedure 41(a)(2), the accused infringer was the prevailing party. 469 F.3d at 1034-36. This Court concluded that the dismissal had changed the parties' legal relationship and that, because the case was dismissed with prejudice under Rule 41(a)(2), it had the necessary judicial imprimatur. *Id.* at 1035. The Court reasoned that if this were not the rule, "the only way for a defendant to obtain a disposition on the merits would be to oppose a dismissal and proceed to litigation on the merits, and would encourage the litigation of unreasonable or groundless claims." *Id.* The Court also noted that the covenant reflected that the patentee was abandoning its claims in the context of the litigation.

This case aligns with *Highway Equipment* closely. Here, Summit abandoned its claims in the face of a summary judgment request for the stated

reason that it was not worth it to try to win the case because the stakes were too low given its expected costs. As in *Highway Equipment*, the District Court conditioned the dismissal on it being with prejudice. Moreover, the District Court conditioned the dismissal on NetApp being permitted to seek its fees. It would be a perverse outcome if Summit could dismiss its case unilaterally under these circumstances and deprive NetApp of the ability to seek the reimbursement of fees by mooting a winning summary judgment request.

Summit's position that NetApp is not a "prevailing party" appears to hinge on the unpublished and interlocutory District Court decision in *Parallel Iron LLC v. NetApp Inc.*, Civil Action No. 12-769-RGA (D. Del. Sept. 12, 2014). In *Parallel Iron,* the court refused to accord prevailing party status to NetApp because the dismissal resulted from licenses granted to third parties after the litigation had started and because it was early in the case. That is irrelevant to the situation here, where Summit conceded its case on the merits on the eve of summary judgment because it wanted to abandon its claims for litigation reasons, not due to events outside the litigation context. In any event, even cast in the best light, Summit's position cannot be said to be free from doubt so the second requirement of the *L.E.A.* test is not met.

Summit also fails to satisfy the third requirement of the *L.E.A.* test. To meet the test, Summit would need to prove that it had no opportunity to raise an

objection to NetApp's prevailing party status at the District Court level. It has not even attempted to meet this requirement. It was free to make any arguments it wished in the District Court. It did not need the *Parallel Iron* decision to make this argument, which is what it appears to imply. The unpublished and interlocutory *Parallel Iron* decision has no precedential value and is not close on the facts either.

Finally, Summit fails the fifth requirement because "substantial justice" does not favor consideration of Summit's "prevailing party" argument. It would stand justice on its head to allow a party such as Summit to avoid an exceptional case finding by folding its hand at the eleventh hour in the face of a meritorious summary judgment request.

### B. Summit's Challenge To The Amount Of The Fee Application Should Be Rejected

For the first time, Summit objects to elements of NetApp's fee application. This is improper and these objections have not been preserved because they were not raised in the District Court. Summit does not attempt to defend on appeal its failure to timely object and thus its objections should not be considered. Moreover, even if they were considered, its belated objections are unsupported on the merits.

#### 1. Summit Did Not Preserve Its Objections To The Amount Of The Fee Application

Despite a fair opportunity to do so, Summit failed to object in the District Court to the amount of NetApp's fee application and in particular did not raise any

of the issues it now raises with this Court. This is a court of review that does not consider issues that were not submitted to the trial court absent exceptional circumstances.[5] *L.E.A. Dynatech,* 49 F.3d at 1531.

A concise recounting of the history of this issue in the District Court is warranted. When the District Court dismissed Summit's patent infringement claims with prejudice, it authorized NetApp to seek attorney fees and issued an order setting forth the briefing schedule for NetApp's application for reimbursement of attorney fees. A1066. NetApp was ordered to file its fee application by January 29, 2013, and Summit was ordered to respond to that application within three weeks, on February 19, 2013.

NetApp submitted its fee application, explaining why fees should be awarded and proving the proper amount with extensive documentation. A1072-321. In its response, Summit opposed the exceptional case finding, including whether NetApp should be reimbursed for its fees – but it did ***not*** challenge NetApp's fee amount in any way. Nor did it identify any reason why it could not submit the objections it now raises in this Court. A2249. It merely stated in a footnote that if the Court were going to grant fees, Summit requested an additional

[5] Summit does not argue that this is an exceptional situation meeting the stringent *L.E.A.* test requiring parties to raise issues in the District Court if they are to be preserved. It does not meet any of the factors. This is not a pure legal issue, it is not of major significance, and Summit had a fair opportunity to raise the issue below.

opportunity to negotiate with NetApp and then to submit a supplemental opposition as necessary. *Id.*

In reply in support of its fee application, NetApp pointed out that Summit had failed to identify any objections to the amount of NetApp's fee application. A2500-1. After NetApp's reply, Summit never sought leave to supplement its opposition to NetApp's fee application to make the objections it raises for the first time in this Court. Summit never sought to negotiate with NetApp about the fee amount or to register any objections. It did not do so before NetApp filed its motion, before its opposition, or after NetApp's reply. Summit did supplement its opposition to address an amicus brief filed in support of NetApp, but did not raise the fee quantification issues in that submission. A2598-2605.

Summit had a fair opportunity to submit objections to NetApp's fee application. On appeal, it does not contend that its opportunity to object in the District Court was somehow inadequate. It does not develop any argument as to why it could not have submitted its objections under the District Court's briefing schedule or have sought to supplement at a later date.

Summit's request to defer opposition to the amount of the fee application was only in a footnote. Summit does not contend that this is the proper way to seek relief in the District Court. D. Del. Civil Rule 7.1.2(a) ("Unless otherwise ordered, all requests for relief shall be presented to the Court by motion.") If

Summit wanted additional time or to defer its opposition to part of NetApp's fee application, it was obligated under well-established rules to bring the required motion. *Id.*

Having failed to raise its objections to the amount of the fee application with the District Court, its objections are not preserved on appeal.

#### 2. The District Court Did Not Abuse Its Discretion In Setting The Amount Of The Fee Award

Summit objects to two elements of the District Court's fee award. It objects to the inclusion of expert expenses and the hourly rates used.

Summit seeks to exclude $234,892.67 from the award in this case that NetApp paid its experts. Summit cites *Amsted Industries Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374 (Fed. Cir. 1994) for the proposition that expert expenses are not reimbursable absent a finding of an abuse of the judicial process. Summit Appeal Brief at 45-46.

In its motion, NetApp requested reimbursement of its expert costs because Summit "abused the legal system." A1076. The District Court found that Summit abused the judicial process throughout its opinion. A5-9. As examples, it found the litigation to be "reckless and wasteful." It found Summit's "motivation was to extract quick settlements that were dwarfed by the costs to litigate." A9. That the District Court did not recite the phrase "abuse of the judicial process" is form over

substance and is best explained by Summit's failure to object to this element of NetApp's application below.

Summit's challenge to NetApp's hourly fees also misses the mark. Summit challenges the absence of District Court findings that were unnecessary because Summit did not object to the hourly rates used by the District Court. Summit submitted no evidence of the proper rates in the District Court. Its appellate reliance on an AIPLA survey regarding "Other East" venues without seeking judicial notice or otherwise justifying such a reference is improper and unsupported.

## CONCLUSION

The District Court did not abuse its discretion and its attorney fee award should be affirmed.

Dated: March 30, 2015 Respectfully submitted,

By /s/ Edward R. Reines

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Attorneys for Defendant-Appellee*

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). This brief contains 8,707 words as calculated by the "Word Count" feature of Microsoft Word 2007, the word processing program used to create it.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point font.

Dated: March 30, 2015

*/s/ Edward R. Reines*
Edward R. Reines

*Counsel for Defendant-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2015, I filed or caused to be filed copies of the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served or caused to be served a copy on all counsel of record by the CM/ECF system.

Dated: March 30, 2015

*/s/ Edward R. Reines*
Edward R. Reines

*Counsel for Defendant-Appellee*