**No. 2015-1103**

# In the
# United States Court of Appeals
## for the Federal Circuit

SUMMIT DATA SYSTEMS LLC,

*Plaintiff-Appellant,*

v.

NETAPP INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the District of Delaware, Case No. 1:10-cv-00749-GMS.
The Honorable **Gregory M. Sleet**, Judge Presiding.

## NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT
## SUMMIT DATA SYSTEMS LLC

ROBERT P. GREENSPOON
FLACHSBART & GREENSPOON, LLC
333 N. Michigan Avenue
27th Floor
Chicago, Illinois 60601
(312) 551-9500

Dated: December 29, 2014          *Attorney for Plaintiff-Appellant*



FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Summit Data Systems LLC _____ v. NetApp Inc. _____

No. _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Appellant _____ certifies the following (use "None" if applicable; use extra sheets
if necessary):

1.    The full name of every party or amicus represented by me is:
Summit Data Systems LLC

_____

2.    The name of the real party in interest (if the party named in the caption is not the real
party in interest) represented by me is:
N/A

_____

3.    All parent corporations and any publicly held companies that own 10 percent or more
of the stock of the party or amicus curiae represented by me are:
Summit Data Systems is 100% owned, indirectly, by Acacia Research Corporation,
trading on the NASDAQ Exchange under the ticker symbol ACTG.

_____

4.  ☑  The names of all law firms and the partners or associates that appeared for the party
or amicus now represented by me in the trial court or agency or are expected to appear in this
court are:
See attached sheet

_____

Nov. 5, 2014 _____
Date

_____
Signature of counsel

Robert P. Greenspoon
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Flachsbart & Greenspoon: Robert Greenspoon

Smith, Katzenstein & Jenkins: Neal Belgam, Robert Beste

Morris, Manning & Martin: Bryan Harrison, David Rabin, Michael Burling, Robert Hoskyn, Andrew McNeil

Proctor Heyman: : Neal Belgam, Melissa Brochwitz Donimirski, Samuel Hirzel, II

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF RELATED CASES ......................................................... 1

JURISDICTIONAL STATEMENT .............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE .................................................................... 2

      A.      Pre-Suit History ........................................................... 2

      B.      The Technology of the Patents-in-Suit ..................................... 5

      C.      Proceedings Against NetApp Before October 5, 2012 .............. 6

      D.      Proceedings Against NetApp On and After October 5, 2012 .. 11

      E.      The District Court Awards Attorneys' Fees and More ............ 16

SUMMARY OF THE ARGUMENT ........................................................... 17

ARGUMENT ........................................................................................... 18

I.      STANDARD OF REVIEW ................................................................. 18

II.     THE DISTRICT COURT'S EXCEPTIONAL CASE FINDING
       RESTS SOLELY UPON ERRORS OF LAW AND FACT AND
       SHOULD BE REVERSED .................................................................. 20

      A.      The District Court Committed Legal Error to Assume that
            License Rights Extinguished All Meritorious Claims at the
            Time of Voluntary Dismissal .................................................. 20

B.    The District Court Committed Legal Error to Assume that any License Defense Benefiting NetApp was Apparent on the Face of the RPX Documents from the Inception of the Case .......... 26

C.    The District Court Committed Errors of Fact and Law to Label Prior Settlements as "Extortionate" When They Reflected Royalty Rates to be Expected in the Industry .......................... 30

III.   THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO CREDIT SUMMIT WITH GOOD FAITH FOR CONCURRING PROMPTLY AND THEN VOLUNTARILY DISMISSING, AND IN FAILING TO ADDRESS THAT NETAPP STRATEGICALLY CONCEALED THE LICENSE DEFENSE UNTIL AFTER FACT DISCOVERY CLOSED .................................................................. 34

A.    Voluntary Dismissal Before a Merits Ruling Made Fee Shifting Inappropriate .............................................................. 35

B.    NetApp's Culpability in Causing Its Own Attorneys' Fees Made Fee Shifting Inappropriate ..................................... 41

IV.   THE DISTRICT COURT COMMITTED LEGAL ERROR WHEN CALCULATING THE AMOUNT OF THE SECTION 285 JUDGMENT ...................................................................................... 45

V.    CONCLUSION .................................................................................. 48

CERTIFICATE OF SERVICE ..................................................................... 49

CERTIFICATE OF COMPLIANCE ............................................................. 50

Matter marked as confidential on pages 3-7, 9, 12, 15, 18, 27-29, 42 and 44 concerns a term in the RPX agreement not otherwise disclosed by the district court's decision. Matter marked as confidential on pages 10, 17, 30 and 32 discloses (at least indirectly) confidential revenues of NetApp and settling parties. Matter marked as confidential on page 30 concerns settlement terms not otherwise disclosed by the district court decision.

# TABLE OF AUTHORITIES

**Cases**                                                                    Page

*Am. Tech., Inc. v. Velocity Micro, Inc.*,
No. 6:11-cv-109-Orl-22GJK, 2012 U.S. Dist. LEXIS 33991
(M.D. Fla. Mar. 14, 2012)............................................................................. 31

*Amsted Indus. v. Buckeye Steel Castings Co.*,
23 F.3d 374 (Fed. Cir. 1994) ....................................................................... 45

*Bywaters v. U.S.*,
670 F.3d 1221 (Fed. Cir. 2012) ................................................................... 46

*Dodge-Regupol, Inc. v. Rb Rubber Prods.*,
No. 3:06-CV-236, 2010 U.S. Dist. LEXIS 31838
(M.D. Pa. Mar. 31, 2010) ................................................................ 36, 38, 39

*EON Corp. IP Holdings, LLC v. FLO TV Inc.*,
No. 10-812-RGA, 2014 U.S. Dist. LEXIS 71753
(D. Del. May 27, 2014) ................................................................................. 33

*Eon-Net LP v. Flagstar Bancorp*,
653 F.3d 1314 (Fed. Cir. 2011) ....................................................... 31, 32, 33

*Fujitsu Ltd. v. Netgear Inc.*,
620 F.3d 1321 (Fed. Cir. 2010) ................................................................... 21

*Hardinge Company, Inc. v. Jones & Laughlin Steel Corp.*,
275 F.2d 37 (3d Cir. 1960) .......................................................................... 36

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
134 S. Ct. 1744 (2014) ........................................................................... 19, 20

*iLOR, LLC v. Google, Inc.*,
631 F.3d 1372 (Fed. Cir. 2011) ............................................................. 18, 19

*Innovative Biometric Tech., LLC v. Toshiba Am. Info. Sys.*,
556 F. App'x. 968 (Fed. Cir. 2014) ............................................................ 37

v

*Jacobsen v. Katzer*,
609 F. Supp. 2d 925 (N.D. Cal. 2009) ......................................................... 36

*Jenkins v. United States*,
307 F.2d 637 (D.C. Cir. 1962) ..................................................................... 22

*Knauf Fiber Glass v. Certainteed Corp.*,
544 F. Supp. 2d 838 (S.D. Ind. 2008) ......................................................... 36

*Larchmont Engineering, Inc. v. Toggenburg Ski Center, Inc.*,
444 F.2d 490 (2d Cir. 1971) ......................................................................... 35

*L.E.A. Dynatech, Inc. v. Allina*,
49 F.3d 1527 (Fed. Cir. 1995) ..................................................................... 35

*Linex Techs. Inc. v. Belkin Int'l, Inc.*,
628 F. Supp. 2d 703 (E.D. Tex. 2008) ......................................................... 21

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ................................................................... 25

*Mathis v. Spears*,
857 F.2d 749 (Fed. Cir. 1988) ..................................................................... 46

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*,
603 F.3d 943 (Fed. Cir. 2010) ..................................................................... 19

*NXP B.V. v. Blackberry, Ltd.*,
No. 6:12-cv-00498-YK, 2014 U.S. Dist. LEXIS 159217
(M.D. Fla. Oct. 21, 2014) ........................................................................... 39

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
134 S. Ct. 1749 (2014) ................................................................... 19, 34, 40

*Parallel Iron, LLC v. NetApp, Inc.*,
No. 12-769-RGA, 2014 U.S. Dist. LEXIS 127850
(D. Del. Sept. 12, 2014) ............................................................................... 35

*Parker-Hannifin Corp. v. Seiren Co.*,
No. 07-104-MPT, 2009 U.S. Dist. LEXIS 26863
(D. Del. Mar. 31, 2009) ................................................................. 38

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
360 F.3d 1295 (Fed. Cir. 2004) ........................................... 35, 38

*R+L Carriers, Inc. v. DriverTech LLC (In re Bill of Lading Transmission & Processing Sys. Patent Litig.)*,
681 F.3d 1323 (Fed. Cir. 2012) ........................................... 24-25

*Taltech Ltd. v. Esquel Enters.*,
604 F.3d 1324 (Fed. Cir. 2010) .................................................. 37

*Wedgetail Ltd. v. Huddleston Deluxe, Inc.*,
576 F.3d 1302 (Fed. Cir. 2009) .................................................. 36

*Woodrow Woods & Marine Exhaust Sys., Inc. v. Deangelo Marine Exhaust, Inc.*,
692 F.3d 1272 (Fed. Cir. 2012) .................................................. 43

## Statutes and Rules

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1295 ............................................................................. 1

28 U.S.C. § 1331 ............................................................................. 1

28 U.S.C. § 1338 ............................................................................. 1

28 U.S.C. § 1927 ........................................................................... 40

35 U.S.C. § 285 ..................................................................... *passim*

Fed. R. Civ. P. 16(c) ................................................................... 38

Fed. R. Civ. P. 16(f) .................................................................... 38

Fed. R. Civ. P. 11(c)(2) ................................................................ 38

Fed. R. Civ. P. 30(b)(6) ........................................................... 9, 41

Fed. R. Civ. P. 37(c) ................................................................... 43

Fed. R. Civ. P. 52(c) ................................................................... 37

## Other Authorities

2013 AIPLA Report of the Economic Survey ............................................ 47

H.R. 3309 (113th Congress) ........................................................ 31

https://access.redhat.com/documentation/en-
US/Red_Hat_Enterprise_Virtualization_for_Servers/2.2/html/Administratio
n_Guide/storageiscsi-multipath.html ............................................. 14

http://linux.netapp.com/docs/debian/iscsi-multipath-configuration-guide . 15

http://www.uspto.gov/ip/global/patents/public_comments.jsp. .................. 31

http://www.kpmg.com/Global/en/IssuesAndInsights/ArticlesPublications/Do
cuments/gvi-profitability-v6.pdf ................................................. 17

Notes of Advisory Committee on 2011 Amendment to Fed. R. Evid. 705 . 23

*McCormick*, Evidence § 13 (1954) ............................................. 23

Robert P. Greenspoon, *Is the United States Finally Ready for a Patent Small
Claims Court?*, 10 Minn. J.L. Sci. & Tech. 549 (2009) ............................. 31

## STATEMENT OF RELATED CASES

None.

## JURISDICTIONAL STATEMENT

This is an appeal of a final decision awarding $1,395,514.62 against Plaintiff-Appellant Summit Data Systems, LLC ("Summit"), entered as a sanction under 35 U.S.C. § 285 on September 25, 2014 (A0001). Summit timely filed a notice of appeal on October 24, 2014 (A2607-08). The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1295.

## STATEMENT OF THE ISSUES

1.    Whether a district court abuses its discretion in finding a voluntarily dismissed patent case to have been "exceptional" when a meritorious claim for damages remained at the time of dismissal.

2.    Whether absent litigation misconduct, a district court abuses its discretion to punish a patentee with sanctions after it concedes a newly raised, previously concealed, affirmative defense and voluntarily dismisses.

3.    Whether a district court errs to award section 285 attorneys' fees that include amounts forbidden by the precedents of this Court, such as expert fees and attorneys' fees based on non-forum hourly rates.

# STATEMENT OF THE CASE

## A.    Pre-Suit History

Acacia Research Corporation ("Acacia") is a publicly traded corporation and a leader in patent licensing. Its operating subsidiaries have a proven track record of licensing success, with more than 1,000 license agreements executed through 2013 (A1343). Acacia subsidiaries level the playing field for individuals and small enterprises, creating opportunities that would not otherwise exist for innovators to realize just rewards promised by the patent system. In a typical rights-acquisition arrangement, Acacia's counterpart (usually an individual inventor or small company) receives an upfront payment, or a percentage of the operating subsidiaries' net recoveries from the licensing and enforcement, or a combination of the two (A1345).

In November 2009, Applied Micro Circuits Corporation ("AMC," an operating company) transferred the two patents-in-suit (U.S. Patent Nos. 7,392,291 and 7,428,581) to an acquisitions company controlled by Acacia (A1457-58). AMC received both an upfront payment, and a share of future licensing recoveries (*Id.*). In May 2010, the plaintiff here, Summit Data Systems, LLC ("Summit") (another Acacia subsidiary), acquired ownership of the patents-in-suit. As is typical in such arrangements, Summit honors the

obligation to share in future licensing recoveries with the original operating company owner, AMC.

In June 2010, Summit granted a royalty-bearing license under the patents-in-suit to RPX Corporation, which is also a publicly traded corporation (A1462-1501). RPX is a "defensive aggregator." Its business involves purchasing patent license rights in specific portfolios. This gives it the right to grant sublicenses to entities who are its "members" as of the effective date. If a non-member happens to be defending against a claim of patent infringement in federal court (or if it is likely that it will), the RPX agreement might contain an option permitting RPX to pay an additional sum to the licensor to purchase a sublicense for that non-member. RPX apparently uses such option rights to market its services and grow its membership roles.

The Summit-RPX agreement from June 2010 spans forty pages, and contains several complex scenarios under which license rights might spring (*Id.*). First, the agreement grants [          ] license rights under the patents-in-suit to RPX (A1465). [                                        

                                                    ] Second, the agreement grants RPX the right, [

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ ] And third, the agreement grants RPX the right [████████████

████████████████ ] to grant sublicenses to specified Option Companies

(A1466-67), which include Appellee NetApp (A1468-69). To do so, RPX

would have to make a payment to Summit of the proper fee under a pre-

negotiated schedule (*Id.*).

RPX never paid, and Summit never received, any funds that would

have granted NetApp sublicense rights through the RPX agreement, as an

Option Company. Nor did RPX ever provide Summit with notice that it had

[████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ ] And, the RPX agreement does indicate that

Microsoft is a member company [████████████████████████████

████████████████ ] But RPX never told Summit that it had [████████████

████████████████████████████████████████████

████████████████████████████████ ]

RPX had an incentive not to [████████████████████████████

████████████████ ] Microsoft was not itself a licensing (or enforcement)

candidate for Summit, and thus did not require RPX to be its "champion" [█

███████████████████████████] On the other hand, for RPX to

[████████] Microsoft would (as eventually happened) reduce NetApp's

liability under the patents-in-suit. This reduction in liability would make it

less economical for NetApp to become an RPX member and/or Option

Company. RPX would have wanted to avoid taking action that would lessen

its marketing appeal.

### B.     The Technology of the Patents-in-Suit

The patents-in-suit are each entitled, "Architecture for providing

Block-level Storage Access over a Computer Network" (A0045, A0069).

The claims are directed to a block-level storage server that operates over a

network, and is capable of using multiple logical connections. Claim 1 of the

'291 patent is representative.

1. A block-level shared network storage system, comprising:

a storage server comprising an array of disk drives, and
comprising a processor that runs a device driver to provide
block-level access to data stored on the array of disk drives,

wherein the storage server is configurable to provide multiple
storage partitions, each of which may be allocated to a different
host computer; and

a host computer coupled to the storage server by at least one
computer network;

wherein the host computer and the storage server perform input/output (I/O) operations over the at least one network using multiple, concurrent logical connections, each logical connection being between the host computer and the storage server over the at least one computer network, such that a first I/O operation is executed over a first logical connection while a second I/O operation is executed over a second logical connection.

(A0066). As can be seen, most of the claim elements govern what the storage server does, with incidental mention of a "host computer" as the piece of equipment with which the storage server interoperates. Despite the relative unimportance of the role played by the "host computer," Summit always acknowledged that a case of infringement against a storage server maker would primarily involve indirect infringement.

### C.    Proceedings Against NetApp Before October 5, 2012

On September 1, 2010, Summit filed the present action against NetApp and eight other makers of storage equipment (A0092-107). Summit pursued claims for inducement of infringement (except to the limited extent of direct infringement via internal corporate use) (A0172-75, A0191). As already mentioned, prior to suit, RPX never notified Summit of [███████ █████████████████████████████████████████████████████████ ███████████████████████████████████████ ]

Shortly after the filing, Fujitsu America obtained [█████████ ███████████████████████████ ] after payment of the required substantial fee,

and Summit filed the required dismissal (A0132, A2237). Then, Netgear [███████████] in November 2011, after another payment of a substantial sublicense fee by RPX to Summit, whereupon Summit dismissed (A0368-69, A2237). Meanwhile, after the filing of a Second Amended Complaint in March 2011, the Court entered a March 29, 2011 scheduling order, setting, among other things, a claim construction briefing schedule for the fall of 2011 and a hearing date of February 12, 2012 (A0030). The pleadings closed on May 2, 2011 (*Id.*). Thereafter, the parties focused their attention on claim construction issues.

On January 11, 2012, defendants served their first set of common requests for production of documents (A0675). Summit timely responded to these request on February 24, 2012 (A0784).

On February 15, 2012, the district court held its claim construction hearing and on March 2 the parties submitted a chart of the remaining terms proposed for construction after post-hearing negotiations (A0679, A0792-94) During this period and shortly thereafter, Summit settled its claims against Hitachi, D-Link and Buffalo Technology, filing the required dismissals (A0788, A0790, A0795-96).

Throughout February and March, the parties exchanged and responded to further initial discovery requests. On March 15, 2012, NetApp

responded to Summit's interrogatory, requesting the basis for NetApp's affirmative defenses of license and exhaustion (A1051-60). In response, and subject to a litany of objections, NetApp responded, "NetApp's investigation is ongoing and NetApp will supplement this interrogatory as additional information becomes available" (A1059-60).

Meanwhile, on March 22, 2012, Summit produced its initial set of documents, under the rolling production practice adopted by the parties (A2238). On March 28, 2012, NetApp produced its initial set of documents (*Id.*). On April 2, 2012, Summit produced additional documents, including the RPX agreement and documents relating to settlements prior to that time (*Id.*). On April 12, 2012, Summit timely responded to NetApp's first interrogatories, providing detailed infringement contentions (A1607-59). Those infringement contentions identified a Microsoft-equipped computer as an exemplary device satisfying the "host computer" limitation (A1619-20, A1638, A1654, each showing Microsoft Windows graphical user interfaces with respect to the "host computer"). They (and Summit's later expert report) also confirmed that NetApp's infringement was based on its practice of an industry standard protocol known as the IETF RFC 3720 iSCSI specification (A1564, A1566-69, A1615, A1650).

On April 13, 2012, with both the RPX agreement and those contentions in hand, NetApp and its codefendant EMC took the deposition of Summit, through its designee (A1323-32, A2610).[1] EMC's examination (with NetApp watching) included a detailed exploration of the RPX agreement (A1329-30, A2610). In response to questioning, Summit's witness indicated that he was not aware of whether the RPX agreement [█████████████████████████████████████████] and referred counsel to the document itself because such was often not the case with RPX agreements (A2610). Despite NetApp's awareness of, and focus on, the RPX agreement and Summit's infringement contentions, it did not supplement its interrogatory answer on license and exhaustion during April 2012.

On April 25, 2012, the district court issued its first and only merits decision. The district court ruled on claim construction. Its Order ruled in favor of Summit, and against NetApp, on nearly every (if not every) substantial dispute (A0814-17).

---

[1] Page A2610 contains page 69 of the Rule 30(b)(6) deposition of Summit. The district court record only goes up to page 68. Summit has moved this Court to add page A2610 (deposition page 69) to the record on appeal. If this Court denies that motion, then it should disregard all reference in this brief to the Summit witness's response to questioning that (1) he was not aware of whether the RPX agreement [████████████████████████████] and (2) that the document must be reviewed to ascertain if this is the case.

On May 24, 2012, again with both the RPX agreement and Summit's infringement contentions in hand, NetApp and its codefendant EMC took the deposition of Ed Treska, an employee of Acacia (A2568). EMC's questions (with NetApp watching) included yet another detailed examination on the RPX agreement – this one spanning 27 pages of transcript (A2568-97). At the end of the deposition, NetApp's lawyer indicated that NetApp had no questions (A2597).

After Summit won the claim construction, the parties completed liability discovery. NetApp failed to supplement its interrogatory answer on license and exhaustion during May 2012, despite engaging in substantive discovery dispute discussions regarding NetApp's other defenses (A2239). On June 22, 2012, NetApp produced its first sales information for the accused product families – a five-page summary of its sales for the period September 21, 2010 through April 27, 2012 (A2239, A2254-58). This summary identified total sales of the accused products of [████████████] of which [███████] were attributable to sales of products using the iSCSI protocol (A2239, A2258). It did not include a breakdown by host computer operating system (*e.g.*, Microsoft vs. Linux or UNIX).

In July 2012, Summit settled its claims with Infortrend and filed the required dismissal (A0818-19).

On July 26, 2012, fact discovery closed. NetApp did not supplement any discovery responses, including the request seeking the bases for its affirmative defenses of license and exhaustion, during the fact discovery period.

In August 2012, Summit settled its claims with Qnap, and filed the required dismissal (A0820).

In September 2012, Summit and NetApp exchanged their initial expert reports, including for liability and damages (A2259-334, A1563-94, A1599). For the "host computer," Summit's liability expert report identified, in a "for example" clause, those that run a Microsoft operating system, where the Microsoft system plays a role as an "initiator" under the standards (A1564-65, A1573). The same report does not state or suggest that Microsoft operating system-equipped computers are the only ones that might qualify. This is apparent from its focus on compliance with industry standards as the way NetApp induces infringement (A1566-69). In fact, the report names "*either* a Windows, Linux *or* UNIX based operating system which includes iSCSI initiator drivers that support multiple TCP connections" (A1573, emphasis added).

### D.     Proceedings Against NetApp On and After October 5, 2012

On October 5, 2012, NetApp emailed Summit, asking for clarification

of its liability and damages expert reports in light of the RPX agreement (A1503-04). This email, coming about six months after the document had been produced and vetted during interrogation of Summit's witness, and more than two months after the close of fact discovery, represents the first time NetApp raised the RPX agreement as supporting a potential license defense. In its email, even NetApp recognized that not all of its products accused of infringement were licensed, stating:

> Thus, the asserted patents are licensed to Microsoft **with respect to allegedly infringing product combinations using Microsoft software**. Summit's rights are therefore exhausted and impliedly licensed with respect to NetApp when third parties **employ systems utilizing Microsoft initiator software**.

> Accordingly, no product sold by NetApp can be used in an infringing manner **when the end user employs Microsoft's initiator software** because each end user's system is licensed through Microsoft's right to have its software used in allegedly infringing products.

(*Id.*) (emphasis added).

On October 10, 2012, with NetApp's email implying that the final condition subsequent must have occurred (*i.e.*, [██████████████████████████████] Summit responded accordingly. In an email, Summit confirmed, in light of the October 5 email, that the RPX agreement on its face appeared to license any storage server utilized with a Microsoft operating system (A1503). Summit did not, however, concede that other

operating systems that were standards-compliant and interoperated with NetApp's storage servers (*e.g.*, UNIX or Linux) would immunize NetApp's deployments. Summit confirmed that future expert discovery would take into account NetApp's new information (*Id.*).

Two days later, on October 12, 2012, Summit served a reply report that took into account NetApp's new information (A1599-1605). The reply report contained expert inferences and opinions that 53% of NetApp deployments would continue to infringe, via use of non-Microsoft operating systems powering the "host computers" (A1604-05). A month later, on November 14, 2012, NetApp deposed Summit's expert. NetApp focused its questioning on whether Summit's expert had witnessed, or analyzed from documents, a full nonlicensed real world deployment (A1676-89). Given the fast-developing series of events, almost entirely caused by the late timing of NetApp's contentions, Summit's expert indicated that he had not because there was no time (A1687-88). Summit's expert stood by his inferences that such direct infringement exists (whether he was a percipient witness to it or not), and stood by his ultimate opinions of infringement (A1686-88). NetApp never submitted competent evidence (through experts or otherwise) that Summit's expert was wrong that 53% of deployments would involve

nonlicensed operating systems within the "host computers" operating under the iSCSI standard.

As mentioned, for there to be infringement, there must be multiple connection capabilities. NetApp did attempt to argue to the district court that only Microsoft-based hosts (and not Linux or UNIX devices) supported a particular type of multipath operation under the iSCSI standard – "MCS" (A1083). NetApp also suggested (incorrectly) that Summit's infringement contentions pointed only to MCS (*Id.*). NetApp thus attempted to show that Summit's contentions had embraced only what the parties eventually agreed are licensed systems. In actuality, Summit had additionally pointed to an alternative UNIX and Linux-supported multipath technology – "MIPO" (A1573). NetApp never refuted this expert analysis that UNIX and Linux support MIPO (because they do).[2] Thus, contrary to NetApp's mistaken presentation to the district court, nonlicensed accused systems included multipath systems. The combination of NetApp storage servers with Linux

---

[2]    *See, e.g.*,    https://access.redhat.com/documentation/en-US/Red_Hat_Enterprise_Virtualization_for_Servers/2.2/html/Administratio n_Guide/storageiscsi-multipath.html (instructions for using Linux with multipath iSCSI operation).

initiators / host computers using multipath technology both existed and fell within Summit's infringement contentions.[3]

With NetApp finally revealing that Summit's claim against it was small – potentially under $600,000 (A2249) – Summit was forced to face economic reality. In analyzing the license provisions of the RPX agreement along with NetApp's new contentions (implying for the first time that [███

████████████████████]), Summit determined that the damages likely recoverable from NetApp and EMC Corporation were only slightly more than the costs and fees that Summit would incur in pursuing the case through trial to an infringement judgment (and possible appeal). Summit decided that the low rate of return did not justify moving forward. Accordingly, and just a few weeks after the October 5, 2012 email, Summit offered to resolve the case with NetApp and EMC by dismissing the whole case with prejudice, each side bearing its own costs and fees. EMC agreed (A0822). When NetApp refused, Summit moved to dismiss with prejudice (A0933). The district court granted the motion, but preserved NetApp's right to seek costs and fees (A1066-67).

---

[3]    *See,    e.g.,*    http://linux.netapp.com/docs/debian/iscsi-multipath-configuration-guide (instructions for configuring Linux for multipath iSCSI operation to work with NetApp devices).

### E.    The District Court Awards Attorneys' Fees and More

In the September 25, 2014 order under appeal, the district court awarded NetApp its attorneys' fees, expert fees and nontaxable costs under 35 U.S.C. § 285 (A0009). The district court ruled on a paper record and without a hearing. The district court found this to be an exceptional case for only two reasons: that Summit was always aware that its only theory of infringement required Microsoft operating systems to satisfy the "host computer" limitation, and that Summit was always aware that such systems were already licensed via the RPX agreement (A0001-09).[4] The district court gave no credit to Summit's decision to dismiss voluntarily, and assigned no culpability to NetApp for delaying its contentions that led to voluntary dismissal (*Id.*). The district court then went on to state additional "support" for its conclusion of exceptionality – namely, that the amounts of Summit's prior settlements with other defendants suggested that its strategy in suing NetApp was part of an "extortion" scheme (A0007-08), ignoring

---

[4] NetApp asserted an additional theory that the district court did not reach: that Summit acted frivolously to assert that NetApp's storage servers constituted what the claims call "storage servers" (A1720-22). Since the district court did not accept this obviously flawed argument (A0006 n.4), this brief will not address it.

that those prior settlements involved royalty rates that were consistent with the industry: [███████████████]⁵

Overlooking Summit's request to brief the issue (A2249), the district court included expert fees within the section 285 award (A0009, A1099 ¶ 7, A1726). It also based its lodestar calculations on conscience-shocking hourly rates ($1,025 for partners, $750 for associates, and $310 for paralegals) (A1756). Thus, the lodestar calculations did not rely on Delaware-forum hourly rates, and did not rest on special findings that Delaware-forum hourly rates should not apply. The district court accordingly entered judgment against Summit in the amount of $1,395,514.62 (plus any additional expenses incurred by NetApp in filing the fee motion, which NetApp waived) (A0009). This appeal followed.

## SUMMARY OF THE ARGUMENT

Summit did the right thing, but the district court punished it. Parties and counsel should be encouraged to dismiss suits promptly and voluntarily when they become uneconomical. They should also be encouraged to dismiss at the point when a defendant makes a disclosure that, for the first time, raises a meritorious affirmative defense. However, district courts cross

---

⁵ *See, e.g.*, http://www.kpmg.com/Global/en/IssuesAndInsights/ArticlesPublications/Documents/gvi-profitability-v6.pdf (p. 14 showing median "Comp/Equip" patent royalty rates between 2% and 3%).

the line into abuse of their discretion when they do what the district court did here: misapply the gesture of voluntary dismissal as a concession that the case never had merit, and reward the dismissed party with a windfall of attorneys' fees rather than hold it responsible for having strategically concealed information about a defense.

Nor should the district court's discretion here ever have been triggered. The only reason the district court believed that it had discretion to find this case exceptional was because it thoroughly misunderstood Summit's infringement theories. Those theories preserved 53% of Summit's original damages claim, notwithstanding any [███████████████████████ ███████████████] And such passthrough was never obvious before NetApp's tardy October 5, 2012 email.

These and numerous other errors merit this Court reversing, or at least vacating and remanding for the reasons considered below.

## ARGUMENT

## I.    STANDARD OF REVIEW

Though the Supreme Court recently abrogated clear error review of "exceptionality" findings in favor of the abuse of discretion standard, this Court's observations in *iLOR v. Google* still ring true today:

> The sanctions imposed under § 285 carry serious economic and reputational consequences for both litigants and counsel, and

'[d]espite our reluctance to second-guess the judgment of trial judges who typically have intimate knowledge of the case, we have the responsibility, in light of the substantial economic and reputational impact of such sanctions, to examine the record with care to determine whether the trial court has committed clear error in holding the case exceptional or has abused its discretion with respect to the fee award. Where we have found error, we have reversed exceptional case findings and vacated attorney fee awards based on those findings.'

*iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1376 (Fed. Cir. 2011) (citing *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 953 (Fed. Cir. 2010)).

This Court now reviews both the "exceptionality" finding, and the decision to award attorneys' fees, under an abuse of discretion standard. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014). Even under *Highmark*, a district court abuses its discretion when it bases its "exceptional case" finding on an error of law or fact. *Id.* at n.2.

In deciding whether a case is "exceptional," the district court should simply consider whether it "stands out from others with respect to the substantive strength of the party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). Such consideration must include analysis of "the totality of the circumstances." *Id.*

## II.     THE DISTRICT COURT'S EXCEPTIONAL CASE FINDING RESTS SOLELY UPON ERRORS OF LAW AND FACT AND SHOULD BE REVERSED

Under *Highmark*, a district court abuses its discretion when it bases its "exceptional case" finding on an error of law or fact. *Highmark*, 134 S. Ct. at 1748 n.2. Here, errors of law and fact drove the district court's analysis. By dint of voluntary dismissal, Summit actually *saved* the parties and the district court from the burden of pressing the case through trial and an infringement judgment. In promptly agreeing with NetApp as soon as NetApp made its tardy statement of a partial license defense, Summit simply recognized for the first time the unattainability of about half of the damages judgment it might otherwise win. As this Court has encouraged parties to do, once the economics of a still-meritorious case became less favorable, Summit lay down its sword. Such upstanding conduct should be encouraged, not punished.

### A.     The District Court Committed Legal Error to Assume that License Rights Extinguished All Meritorious Claims at the Time of Voluntary Dismissal

First, the district court misunderstood Summit's theories of infringement. This misunderstanding snowballed into a belief that Summit never had a meritorious infringement claim, from case inception through voluntary dismissal. But the actual infringement theories were not as narrow

as the district court believed. They never required a Microsoft operating system for the "host computer" limitation. A user of an iSCSI-using NetApp storage server also infringed while using Linux- or UNIX-based "initiators" with multiple logical connections (A1566-69, A1573, A1604-05).

Summit's opening expert report from Dr. Zimmerman made the standards-based scope of Summit's infringement contentions perfectly clear. But the district court disregarded it. As many courts have noted, including this one, practice of an industry standard may be used to demonstrate the practice of particular patent claim limitations. *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1327 (Fed. Cir. 2010) ("[I]f an accused product operates in accordance with a standard, then comparing the claims to that standard is the same as comparing the claims to the accused product."); *see also Linex Techs. Inc. v. Belkin Int'l, Inc.*, 628 F. Supp. 2d 703, 709 (E.D. Tex. 2008) ("Therefore, the use of an industry standard as the basis for infringement contentions is permissible . . . .").

Here, in his opening report, Dr. Zimmerman referred repeatedly to the iSCSI standards (A1564, A1566-69, A1573). Those standards govern how the NetApp storage servers work in the infringing mode, mapping onto most of the claim limitations (*Id.*). For those few claim limitations that require a "host computer" (relevant to the inducement contention), Dr. Zimmerman

gave a non-limiting example of a Microsoft-based "initiator" (A1573). But that was in the context of standards-based functionality (*Id.*). Dr. Zimmerman did not point out anything unique or idiosyncratic about a Microsoft "initiator" versus one from another source. In fact, though one would not know it reading the district court's decision, NetApp did not dispute that a Linux- or UNIX-based "initiator" using multipath technology (*e.g.*, MIPO) would function the same way with regard to the "host computer" limitations.

Summit's reply expert report made this even clearer. Dr. Zimmerman signed this report merely seven days after NetApp first offered its tardy partial license contention to Summit, and only two days after Summit concurred in the analysis (A1599-1605). In his reply report, lacking discovery from NetApp of a breakdown among "initiator" operating systems, Dr. Zimmerman reasonably inferred that 53% of those "initiators" were Linux- or UNIX-based (or the like), and directly infringed by interoperating with NetApp iSCSI storage servers over multiple logical connections. Coming from an expert who qualified under Federal Rule of Evidence 702, such an inference carries as much evidentiary weight as any other part of his opinion. *See, e.g.*, *Jenkins v. United States*, 307 F.2d 637, 643 (D.C. Cir. 1962) (noting that the expert contributes "a power to draw

inferences from the facts which a jury would not be competent to draw.") (citing *McCormick*, Evidence § 13 (1954)); *see also* Notes of Advisory Committee on 2011 Amendment to Fed. R. Evid. 705 ("The Committee deleted all reference to an 'inference' . . . because any 'inference' is covered by the broader term 'opinion.' Courts have not made substantive decisions on the basis of any distinction between an opinion and an inference.").

The district court decision did not acknowledge Summit's right to present such expert evidence at trial, even though Summit tried to point it out during briefing on the section 285 motion. Inexplicable as that was, the district court overlooked even more. During the briefing, Summit provided additional evidence in the form of three exhibits (A2448-66). These included unquestionably authentic documents showing or suggesting that NetApp's systems interoperate under the iSCSI standard with Linux- and UNIX-based (*i.e.*, unlicensed) "initiators" as the host computers, and that non-Microsoft operating systems support multipath (including MCS) (*Id.*). There likely would have been more, had NetApp timely put its partial license defense relating to Microsoft "initiators" in issue during fact discovery.

In its totality, the evidence showed that the "host computer" of the asserted claims was agnostic to which operating system might serve as the "initiator" in a multiple-logical-connection iSCSI context. It also showed,

via reasonable expert inferences, that the existence of non-licensed operating systems preserved 53% of the claim, even taking into account any passthrough of Microsoft license rights. Therefore, the district court committed legal error in holding that, "[t]hroughout litigation, Summit has never been able to identify an alternative theory of infringement that did not require NetApp's products interacting with Microsoft software" (A0006).

To its credit, the district court did attempt to cite support for this incorrect ruling. But it only cited Dr. Zimmerman's deposition testimony, and even then only pages 109-10 (*Id.*). On the cited pages, Mr. Reines inartfully asks Dr. Zimmerman a series of questions about whether he had tested or analyzed for the existence of a specific instance of a direct infringer deploying a completely non-licensed set of components (A2218-19). Dr. Zimmerman understandably indicated that he had not (*Id.*).

This line of questioning overlooked not only the troubling fact that NetApp waited until after the close of fact discovery, and after Dr. Zimmerman's opening expert report, to spring its partial license defense. It also overlooked this Court's precedents permitting Dr. Zimmerman to infer the presence of direct infringers, without identifying direct evidence of a specific named customer deployment. *See R+L Carriers, Inc. v. DriverTech LLC (In re Bill of Lading Transmission & Processing Sys. Patent Litig.)*,

681 F.3d 1323, 1336 (Fed. Cir. 2012) ("This court has upheld claims of indirect infringement premised on circumstantial evidence of direct infringement by unknown parties.") (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009) ("[T]he jury in the present case could have reasonably concluded that, sometime during the relevant period from 2003 to 2006, more likely than not one person somewhere in the United States had performed the claimed method using the Microsoft products.") (alteration in original)).

The district court in its decision did not show any awareness of why Mr. Reines's questioning was not dispositive under this Court's precedents, or of NetApp's discovery failures preceding such questioning. Equally overlooked by the district court was the testimony on pages 108-09, during which Dr. Zimmerman confirmed to Mr. Reines that he did ***not*** speculate to infer that completely non-licensed infringing systems existed (A2217-18). And critically, Dr. Zimmerman never repudiated his expert reports at his deposition. They remained markers of the evidence he would have supplied at trial. Dr. Zimmerman would therefore have properly demonstrated at trial that NetApp induced infringement by its end users who deployed "host computers" running the remaining nonlicensed 53% of operating systems.

**B.    The District Court Committed Legal Error to Assume that any License Defense Benefiting NetApp was Apparent on the Face of the RPX Documents from the Inception of the Case**

Even if 53% of the case did not remain viable at the time of voluntary dismissal, the district court committed a second legal error. The second error is apparent from the underlying RPX license itself. While the district court's decision criticizes Summit for not realizing that Microsoft passed through license rights to NetApp via the RPX agreement (A0001-09), the document by itself simply does not lead to that conclusion. The district court should have found as a matter of law that there were reasonable inferences of ***no*** license-passthrough on the face of the RPX license, and that one key piece of information extrinsic to the document itself was missing. For these reasons, even as to the 47% of the NetApp infringement that received a passthrough license, the district court committed legal error to conclude that such licensed status should have been obvious to Summit before suit.

First, RPX signed off on terms that assumed that NetApp did not have any rights under the RPX document. RPX's business as a "defensive aggregator" relies on collecting potential rights for nonmembers, that it may then market to sign up new members. That is exactly what RPX did here, with respect to NetApp. Under the complex terms of the RPX license, NetApp was one of the companies that the parties defined under the term

"Option Companies" (A1468-69). Section 1.4 of the agreement goes on to grant RPX the right to "grant and authorize sublicenses in RPX's sole and absolute discretion" to such companies (including NetApp) (A1466-67). However, Sections 1.5 and 2.1 would then require RPX to pay a sum of [██████████████████████████████████] for the privilege of sublicensing NetApp (A1467, A1468-69). Critically, RPX was in the best position to know whether any company already had passthrough rights through RPX membership, and thus [███████████████████] RPX's belief that NetApp could be an Option Company leads to a reasonable inference, on the face of the agreement, that NetApp did not have rights through the agreement.

Second, even the rights-passthrough mechanism that the district court believed gave NetApp rights did not do so until and unless there was a condition subsequent to execution of the RPX agreement – [████



27



(A1465-66). Therefore, read as a whole, the RPX agreement establishes three general categories of entities: (1) RPX itself, who obtained a license via execution of the agreement; (2) Option Companies, who might obtain a sublicense if RPX paid Summit additional funds; and [███████████ ███████████████████████████████████████████ ███████████████████████████████████ ]

Until October 5, 2012, Summit had no indication from any source that RPX had [███████████████████████████████████████ ████████ ] Without this missing piece of information, the RPX agreement by itself could not lead to a firm conclusion that Microsoft had such rights, and that NetApp deployments that included a Microsoft technology would be immune from suit. Summit reasonably accepted the October 5, 2012, partial license contention from NetApp (A1503-04) as the missing piece that

completed that chain.[6] Five days later, on October 10, 2012, Summit concurred in NetApp's analysis, complying with all obligations under the RPX agreement, thereupon turning its attention for a brief time toward litigating the non-licensed instrumentalities.

Thus, the district court erred as a matter of law in dismissing Summit's demonstration that the license document by itself was ambiguous about Microsoft's license (and therefore NetApp's partial license). It reasoned (incorrectly) that "Summit did not appear to find the License Agreement ambiguous when it readily concurred in its email that 'no product sold by NetApp can be used in an infringing manner when the end user employs Microsoft's initiator software'" (A0007). This reasoning omits the role played by the late-breaking October 5, 2012 email that Summit reasonably accepted as a representation, for the first time, that [███████ ████████████████ ]

Likewise, the district court erred as a matter of law in reasoning that "[a]t best, [████████] argument states they were careless in reading their own multi-million dollar License Agreement before embarking on a lawsuit spanning several years and costing the parties and the court countless

---

[6] It was reasonable to conclude, of course, that RPX was in communication with NetApp and its counsel. The RPX agreement presupposed that RPX would market to NetApp the benefits of becoming a member.

resources" (*Id.*). In reality, no amount of merely "reading" the RPX agreement would have given the reader any certainty that Microsoft held a license, and could therefore have passed through such rights to NetApp. In fact, the opposite is true, since (as explained above) even RPX did not act as if this were the case.

### C. The District Court Committed Errors of Fact and Law to Label Prior Settlements as "Extortionate" When They Reflected Royalty Rates to be Expected in the Industry

Deepening the errors in its analysis, the district court found that "Summit's practice of extracting settlements worth a fraction of what the case would cost to litigate supports a finding of exceptionality" (*Id.*). However, the district court made no findings to undermine Summit's calculation that the settlements with other defendants ranged from between [ ███████████ ] of gross sales (A2249).[7] While the absolute values of these agreements happened to be $170,000 or less, the rates themselves were consistent with commercial practices in the industry. *See* footnote 5, above.

---

[7] The same analysis by the district court also overlooked Summit's successful licensing outside the context of direct settlements between Summit and defendants: the RPX agreement's license amount of [ ██████ ]; Fujitsu's [ ████████████████████████ ]; Netgear's [ ████████████████████████ ] and Summit's predecessor's license to ███████████████████████████████████████████████████

Instead of giving credit for the rates, and recognizing that sometimes even meritorious claims do not justify large settlements, the district court demeaned the gross values as "nuisance" amounts (A0007-08).[8] In doing so, the district court misapplied the reasoning from this Court's decision in *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327-28 (Fed. Cir. 2011). While the district court was correct that *Eon-Net* involved a non-practicing entity plaintiff who sought low dollar settlements from numerous defendants, and that such activity supported subjective bad faith, the district court omitted key facts that drove that decision. In particular, this Court only found the amounts "extortionate" in light of a previous finding that the underlying litigation was "meritless" because of a faulty claim construction. *Id.* at 1327. That is not possible here, for reasons explained above.

---

[8] In the most recent major bill in Congress for patent reform, H.R. 3309, the House approved a study of the need for a patent small claims court, to mitigate the unfairness to the **patentee** of expensive litigation. https://www.congress.gov/bill/113th-congress/house-bill/3309. The USPTO previously solicited comments on this. http://www.uspto.gov/ip/global/patents/public_comments.jsp. Many groups, including the AIPLA and the United Inventors Association (UIA), responded to the USPTO with detailed explanations of why there is a need for an inexpensive tribunal to assess "small" patent claims. *Id.* In full disclosure, the undersigned is a member of the Board of Directors of the UIA and authored its response to the request for comment. The undersigned also authored the academic paper that preceded the USPTO's and Congress's interest in the subject: Robert P. Greenspoon, *Is the United States Finally Ready for a Patent Small Claims Court?*, 10 Minn. J.L. Sci. & Tech. 549 (2009).

Even if the "meritless" label were somehow appropriate in hindsight, *Eon-Net* is inapposite. There, the patentee had sued over 100 diverse companies, dismissing each of them after seeking and, in nearly all cases receiving, a quick settlement. As this Court explained:

> At the time that the district court made its exceptional case finding, Eon-Net and its related entities, Millennium and Glory, had filed over 100 lawsuits against a number of diverse defendants alleging infringement of one or more patents from the Patent Portfolio. *Id.* at 2-4, 16. Each complaint was followed by a "demand for a quick settlement at a price far lower than the cost of litigation, a demand to which most defendants apparently have agreed." *Id.* at 16. In this case, as with the other cases, Eon-Net offered to settle using a license fee schedule based on the defendant's annual sales: $25,000 for sales less than $3,000,000; $50,000 for sales between $3,000,000 and $20,000,000; and $75,000 for sales between $20,000,000 and $100,000,000.

*Id.* As other courts have noted, *Eon-Net* simply does not apply where, like here, only a handful of settlements are involved. *See, e.g., Am. Tech., Inc. v. Velocity Micro, Inc.*, No. 6:11-cv-109-Orl-22GJK, 2012 U.S. Dist. LEXIS 33991, at *14 (M.D. Fla. Mar. 14, 2012) (15 settlements). And, simple math reveals that the requested royalties of *Eon-Net* range as low as 0.075%, which is [███████████████] lower than the [█████████] rates that Summit succeeded in securing here. Nor did the record contain (or the district court find) a strategy of filing complaints and following them with a "demand for a quick settlement," as did the record in *Eon-Net*. And here, in

a further distinction from *Eon-Net*, Summit resoundingly won the claim construction, and several settlements followed.

In short, even under *Eon-Net*, no "subjective bad faith" may be inferred from relatively small licenses with other defendants, in the absence of a proper finding that the underlying case lacked merit. *Cf. EON Corp. IP Holdings, LLC v. FLO TV Inc.*, No. 10-812-RGA, 2014 U.S. Dist. LEXIS 71753, at *6-7 (D. Del. May 27, 2014) ("It cannot be the case that a [███] plaintiff may be subjected to monetary sanctions for failing to drop a case against a defendant if the cost of litigation exceeds the potential recovery."). And even where cases are deemed "meritless," *Eon-Net* does not support subjective bad faith in the context of only about four prior licenses, where each consummated an exchange of license rights at royalty rates consistent with the industry.[9] The district court's attempt to find "subjective bad faith" suffered from multiple legal and factual errors.

---

[9] The very existence of *Eon-Net* as precedent provides accused infringers with greater leverage to negotiate lower settlement amounts, which causes more cases to fall within the parameters of *Eon-Net* itself – a vicious circle. That is one reason why the relevant part of *Eon-Net* should be overruled by the Court *en banc*. There is also an obvious logical flaw. When a patentee loses on the merits in a dispute, it makes no sense to declare, in hindsight, that settlements reached during a period when a patentee is presumed to have acted in good faith demonstrate a nefarious *mens rea*. Once a patentee loses a difficult struggle to defend its rights in court, all of the patentee's previous efforts ***not*** to hold up earlier infringers for the full costs of litigation cannot retroactively show that there was evil intent all along.

### III. THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO CREDIT SUMMIT WITH GOOD FAITH FOR CONCURRING PROMPTLY AND THEN VOLUNTARILY DISMISSING, AND IN FAILING TO ADDRESS THAT NETAPP STRATEGICALLY CONCEALED THE LICENSE DEFENSE UNTIL AFTER FACT DISCOVERY CLOSED

Even if this Court could overlook the multiple legal or factual errors, the district court still abused its discretion. The ruling below sets a dangerous precedent. Parties should be praised, not punished, when conceding within days after an opponent's first assertion of an otherwise waivable claim or affirmative defense. It would be difficult to imagine endorsing the district court's ruling if the tables were turned. For instance, if an infringer makes an offer of judgment admitting liability for patent infringement within days of the affirmative claim, it is difficult to imagine any court ruling that the infringer's conduct properly merited "exceptional case" sanctions, even if the underlying infringement had been willful.

The district court should also have, but did not, take into account the "totality of the circumstances" under the *Octane* standards. *Octane Fitness,* 134 S. Ct. at 1756. Here, despite using that phrase, the district court wrongly ignored NetApp's sharp practices that caused it (and Summit) to incur additional fees. NetApp failed to respond to discovery requests in a timely way that would have led to an even earlier voluntary dismissal. It then presented a "gotcha" defense after causing six months of burden and

expense for both itself and Summit. The district court abused its discretion to reward such conduct.

### A.   Voluntary Dismissal Before a Merits Ruling Made Fee Shifting Inappropriate

Summit's voluntary dismissal in good faith should have foreclosed a fee award.[10] Sound precedent under section 285 counsels strongly, if not conclusively, against such an award. *See Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1304 (Fed. Cir. 2004) ("[W]e fail to see how a changed legal theory that leads to the voluntary dismissal of a lawsuit can amount to bad faith litigation."); *see also Larchmont Engineering, Inc. v. Toggenburg Ski Center, Inc.*, 444 F.2d 490, 491 (2d Cir. 1971) ("We find no abuse of discretion in Judge Port's ruling. Indeed, to have ruled otherwise would have been extraordinary. . . . After pretrial discovery revealed the weaknesses of its claims, Larchmont may well have decided in good faith to minimize

---

[10] Long after briefing had closed in the district court, and just before the ruling on appeal, precedent emerged for the first time supporting that a voluntary dismissal of a patent suit with prejudice, in the absence of a covenant not to sue, does not make the defendant a "prevailing party" under section 285 and this Court's precedents. *Parallel Iron, LLC v. NetApp, Inc.*, No. 12-769-RGA, 2014 U.S. Dist. LEXIS 127850, at *5-11 (D. Del. Sept. 12, 2014). Though Summit initially conceded "prevailing party" status, this Court has the power to set aside, and should set aside, the appellate waiver doctrine and consider the issue. *See L.E.A. Dynatech, Inc. v. Allina*, 49 F.3d 1527, 1531 (Fed. Cir. 1995). To be clear, the argument in the body text assumes that NetApp was, in fact, a "prevailing party." The discussion in this footnote merely points out an additional ground for reversal.

litigation expense by foregoing its claims and by taking a voluntary dismissal. Such a move should not be discouraged by the threat of imposing attorney fees."); *Dodge-Regupol, Inc. v. Rb Rubber Prods.*, No. 3:06-CV-236, 2010 U.S. Dist. LEXIS 31838, at *38-39 (M.D. Pa. Mar. 31, 2010) ("[W]here a party voluntarily dismisses a case, courts have held that the proper exercise of discretion typically entails adherence to the American Rule with each side bearing its own costs.") (citing *Wedgetail Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302 (Fed. Cir. 2009) (voluntary dismissal, fee petition denied); *Hardinge Company, Inc. v. Jones & Laughlin Steel Corp.*, 275 F.2d 37 (3d Cir. 1960) (same); *see also Jacobsen v. Katzer*, 609 F. Supp. 2d 925, 931 (N.D. Cal. 2009)); *Knauf Fiber Glass v. Certainteed Corp.*, 544 F. Supp. 2d 838, 866 (S.D. Ind. 2008) ("The most salient and exceptional aspect of this case is that Knauf promptly and voluntarily dismissed its claims in response to the prior art . . . . That decision is powerful evidence that Knauf was not acting in bad faith at any time, either in the litigation or in the patent prosecution.").

Absent a finding of litigation misconduct, neither this Court, nor any pre-1981 regional court of appeals, has ever affirmed section 285 sanctions against a patentee who had voluntarily dismissed its action prior to a merits

ruling.[11] Here, Summit **won** the only merits ruling – the claim construction.

No summary judgment motion was pending.[12] When a patentee dismisses its

case before any liability rulings, especially having won the claim

construction and before the pendency of any summary judgment motions, a

district court should not award fees against it. This is true whether or not the

case meets the Supreme Court's more liberal test of "exceptionality."

Indeed, by recently lowering the threshold for finding a case "exceptional,"

the Supreme Court, in effect, heightened the importance of the proper use of

discretion when actually awarding fees after such a finding.

---

[11] *Innovative Biometric Tech., LLC v. Toshiba Am. Info. Sys.*, 556 F. App'x. 968 (Fed. Cir. 2014) is the closest possible counterexample, but involved a voluntary dismissal in the backdrop of severe litigation misconduct. Among the kaleidoscope of misdeeds found by the district court were: requesting multiple delays to prevent the day of reckoning from occurring, proposing a special master but objecting to one's appointment, failing to oppose a summary judgment motion but instead complaining of a need for more discovery when actually in possession of all of the facts, naming prior art (known pre-suit) that invalidated the patents-in-suit as the infringing instrumentality, and dismissing at the eleventh hour knowing that an adverse decision based on the long-delayed summary judgment ruling was imminent. *See also Taltech Ltd. v. Esquel Enters.*, 604 F.3d 1324, 1334 (Fed. Cir. 2010) (affirming § 285 award based on trial misconduct, such as "dismissal of its damages claim after Esquel conducted discovery and prepared a defense; waiver of a jury request only weeks before trial and after Esquel had extensively prepared; voluntary dismissal with prejudice, in the middle of trial, of five of its claims of infringement in order to avoid responding to Esquel's motion for entry of judgment pursuant to Fed. R. Civ. P. 52(c); [and] withdrawal of an International Trade Commission complaint shortly before the hearing began.").

[12] NetApp did, though, file a short letter-brief requesting permission to file a summary judgment motion (A824-27).

Too many negative consequences follow if this Court holds otherwise. Parties should be incentivized to dismiss cases where appropriate. The federal courts advance sanctions policies that encourage the resolution of cases. *See, e.g.*, Fed. R. Civ. P. 16(c) & (f) (authorizing sanctions where a party or its attorney fails to participate meaningfully in a pretrial conference involving, among other things, settlement discussions); *Dodge-Regupol, Inc.*, 2010 U.S. Dist. LEXIS 31838, at *38-40 (citing "profound and negative implications" from exercising discretion to sanction a voluntary dismissal, "since it would suggest that litigants who acknowledge changed circumstances may be punished for their candid acknowledgment that an action should be abandoned."). Even when a party violates Rule 11 by bringing a frivolous complaint, that party has a safe harbor period within which to dismiss without consequence. *See* Fed. R. Civ. P. 11(c)(2).[13]

In patent litigation, a case that may seem nonfrivolous and winnable upon filing might suffer a series of rulings that, while not lethal, make the case uneconomical. *Q-Pharma, Inc.*, 360 F.3d at 1304; *Parker-Hannifin Corp. v. Seiren Co.*, No. 07-104-MPT, 2009 U.S. Dist. LEXIS 26863, at *11-12 (D. Del. Mar. 31, 2009) ("Parties should be able to terminate

---

[13] Perversely, had NetApp's October 5, 2012, email threatened sanctions under Fed. R. Civ. P. 11 based on the same partial license theory, Summit's October 10, 2012, concurrence would have immunized it from such sanctions.

litigation when costs make trial an unattractive remedy or when other litigation strategies develop. Parker's decision to dismiss based on a cost-benefit analysis is evidence of neither materially inappropriate conduct nor bad faith litigation."). If such a party or its trial counsel knew that it faced a strong possibility of sanctions, and potential ethics investigations that often follow after an award of sanctions, they would have a strong incentive to keep fighting. *Dodge-Regupol*, 2010 U.S. Dist. LEXIS 31838, at *40 ("[W]e believe that sanctions should not be imposed in a fashion which encourages parties to continue with possibly meritless litigation. Instead, sanctions practice should encourage voluntary acknowledgments by parties that the time for litigation of an issue has drawn to a close."). The downside risk would motivate parties and counsel to eschew voluntary dismissal in favor of pushing the case to trial. *Id.* Thus, a policy of awarding attorneys' fees after voluntary dismissal but before any negative merits ruling incentivizes wasteful litigation to the detriment of both the parties and the court system itself. *See NXP B.V. v. Blackberry, Ltd.*, No. 6:12-cv-00498-YK, 2014 U.S. Dist. LEXIS 159217, at *16-19 (M.D. Fla. Oct. 21, 2014) ("[Plaintiff's] choice to drop these two patents, rather than pursuing them to verdict and then appealing the claim construction order, actually weighs in favor of a finding of reasonableness.").

There admittedly exists a contrary policy: deterrence. Deterrence is one of the considerations the Supreme Court indicates a district court should consider under section 285. *See Octane Fitness*, 134 S. Ct. at 1756 n.6 (citation omitted). But the Supreme Court did not indicate that the policy of deterrence trumps the policy in favor of the resolution of disputes in the context of voluntary dismissals. And, other tools fill the gap perfectly well. Those tools include 28 U.S.C. § 1927 (allowing lawyers to be sanctioned for vexatiously multiplying the proceedings) and the district courts' inherent authority. Each of these requires misconduct embodying, or approaching the level of, a fraud on the court. Thus, tools already exist to deter and punish those who voluntarily dismiss who are actually culpable. There is no need to extend section 285 to include sanctions against parties who voluntarily dismiss before a negative merits ruling and who do not engage in litigation misconduct. Such an extension would cause an unintended (and unneeded) chilling effect, deterring meritorious cases as well.

Thus, the district court abused its discretion to shift fees to punish a voluntary dismissal with prejudice without there having been any litigation misconduct or negative merits rulings against the patentee. At a minimum, this Court should remand with instructions to factor into the totality of the

circumstances how Summit's conduct in voluntarily dismissing reflects good faith, and actually advanced laudable policies of the federal court system.

**B.    NetApp's Culpability in Causing Its Own Attorneys' Fees Made Fee Shifting Inappropriate**

Even beyond abusing its discretion to award fees against Summit after it voluntarily dismissed, the district court failed to take into account NetApp's culpability. NetApp has never explained why it violated its discovery obligations. It only revealed its partial license contentions after the close of fact discovery. Specifically, NetApp pled a license defense early in the case, but without any facts. (A0123). Summit accordingly asked for NetApp's contentions. (A1059-61). While that discovery request was in force, Summit timely produced its RPX license on April 2, 2012 (A2238). Summit acted consistently with the parties' practice of making rolling productions, producing the RPX agreement only one week after NetApp itself began producing documents (*Id.*).

NetApp immediately became aware of how the RPX license factored into its litigation strategies, but remained silent about its intentions or contentions. On April 13, 2012, NetApp's co-defendant EMC (with NetApp counsel watching) marked the RPX license as an exhibit during the deposition of Summit's Rule 30(b)(6) designee (A1329). EMC asked Summit's witness many questions about the document (A1329-30). After

EMC asked him if he believed that the license automatically licensed RPX members (such as Microsoft), he indicated that [████████████ ██████████] and it would depend on the exact terms within the document (A2610). In particular, Summit's witness correctly explained that sometimes an RPX license automatically grants members license rights, and sometimes it requires additional action by RPX (*Id.*). On May 24, 2012, NetApp counsel watched yet another deposition concerning the RPX agreement, asking no questions of its own (A2568).

Meanwhile, Summit's March 2012 interrogatories had already sought the basis for any license affirmative defense (A1059-61). But NetApp failed to supplement its answers before its April 13, 2012 deposition examination to state any reliance on the RPX license. In fact, NetApp did not supplement its answers after Summit's testimony. NetApp never supplemented its answers concerning license or exhaustion. Fact discovery closed on July 26, 2012, without NetApp asserting any reliance on the RPX license to support any partial (or total) license defense (A2239). Thus, by the close of fact discovery, NetApp had not provided a single license or exhaustion factual contention. Only after Summit's opening round of expert reports did NetApp first raise its partial license defense contention, within its October 5, 2012 email (A1503-04).

These procedural facts reveal two important points. First, NetApp violated Fed. R. Civ. P. 26(e) by failing to supplement its contentions in a timely manner. Under prevailing law, it likely had no right to bring forth a license defense that it had not so raised. *Woodrow Woods & Marine Exhaust Sys., Inc. v. Deangelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1282-83 (Fed. Cir. 2012) (affirming that failure to supplement interrogatory led to Rule 37(c) exclusion of such evidence at trial). It was not until October 5, 2012, that it arguably had the right to make such contentions at any future trial. Five days later, Summit concurred in the partial license analysis. But the district court improperly assigned no responsibility to NetApp for the timeline of events, instead making contradictory rulings. The district court agreed with Summit that license was an affirmative defense that NetApp had the burden of proving (A0007). But it inexplicably then held that NetApp "need not establish an affirmative defense" when that defense makes a case "unfounded" (*Id.*). At best, this was hindsight logic. At worst, it was circular.

Second, the fact that it took NetApp itself six months to appreciate its own partial defense – after exceedingly close scrutiny of the RPX agreement during its use at the April 13, 2012, deposition of a Summit designee and its later use at a May 24, 2012 deposition – corroborates that the viability of a

license defense was far from obvious. Lawyers charging rates of up to $1,025 per hour (discussed in the next section) must hold themselves forth as the most skilled lawyers in the country. If even they missed spotting the issue for so long, how can Summit be blamed for the same? While NetApp's October 5 email (A1503-04) purports to cite a recent expert report as prompting the partial license assertion, that was clearly not so. Summit's earliest infringement contentions from before the April 13, 2012 deposition exemplify the "host computer" claim application by pointing to a Microsoft-based user interface (A1619-20). And, RPX had incentives [███████ █████████████] knowable by all the parties on the face of the RPX agreement. As eventually happened, [██████████████████] reduced NetApp's liabilities under the patents-in-suit. This would have been known to diminish RPX's ability to market its "aggregator" services to NetApp, because NetApp would not need them as much.

If, on the other hand, NetApp's partial license defense were as obvious on the face of the document as the district court apparently believed, then the district court failed to explain how it could excuse NetApp's equally obvious strategic concealment. The district court's decision never justifies NetApp's tardy invocation of the license defense. NetApp indisputably waited until after the parties and the Court had been burdened with six

additional months of effort to complete fact discovery, commence expert discovery, and move the case to trial. But for NetApp's conduct, voluntary dismissal would have occurred at least six months before it did.

In short, regardless of whether the district court had any sound basis for declaring this case "exceptional," the district court abused its discretion to award fees. It improperly failed to credit Summit's good faith in voluntarily dismissing, and improperly failed to assign any responsibility to NetApp for its strategic concealment that failed to bring the defense into existence until October 5, 2012.

## IV.    THE DISTRICT COURT COMMITTED LEGAL ERROR WHEN CALCULATING THE AMOUNT OF THE SECTION 285 JUDGMENT

Even if this Court affirms the award of sanctions, it should at least vacate and remand with instructions to correct the clear legal error infecting how the district court performed the calculations.

First, this Court forbids district courts from including expert expenses within the calculation of a section 285 award absent a finding of "a fraud on the court or an abuse of the judicial process." *Amsted Indus. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378-379 (Fed. Cir. 1994). The *Amsted* court reasoned that "not every case qualifying as 'exceptional' under section 285 will qualify for sanctions under the court's inherent power." *Id.* (citing

*Mathis v. Spears*, 857 F.2d 749, 758 (Fed. Cir. 1988) (characterizing the case as a "'very exceptional' case of 'gross injustice'")). Despite the fact that the district court never found any such "fraud" or "abuse," the district court's order awarded expert fees, relying solely on Section 285 (A0009, A1099 ¶ 7, A1726). Fully $234,892.67 of the overall award was improper on this ground alone (*Id.*).

Second, the district court failed to use the proper hourly rate. To determine reasonable attorneys' fees, courts generally use the "lodestar" approach, where the number of hours reasonably spent is multiplied by a reasonable hourly rate. *Bywaters v. U.S.*, 670 F.3d 1221, 1225-29 (Fed. Cir. 2012). Adjustments up or down may be made in "rare" and "exceptional" circumstances, and a court must justify its deviation with specific evidence. *Id.* at 1229-30. Reasonable hourly rates use the rate of the forum court. *Id.* at 1232-33. The limited exception to the forum rule involves situations where "local counsel is either unwilling or unable to take the case," but "only where supported by specific evidence that no local attorneys possess the 'special expertise' necessary to take the case or that no local attorneys were willing to take the case." *Id.* at 1233-34 (citations omitted) (internal quotation marks omitted). This forum rate is, of course, that of the District of Delaware.

Despite this rule, the rates NetApp presented, and that the district court accepted, shock the conscience. They include Mr. Reines's hourly rate of up to $1,025 per hour, which well exceeds NetApp's actual Delaware local counsel rate of $395 per hour (A1732-33). One of Mr. Reines's associates billed at $750 per hour. (A1733). Paralegals billed up to an equally shocking $310 per hour. (A1756). Meanwhile, according to the most recent AIPLA Report, Delaware is located in the "Other East" location for compiling fees data. 2013 AIPLA Report of the Economic Survey, at 3. In 2012, the average partner billing rate in that region was $412, and the average associate's billing rate was $278. *Id.* at I-34, I-48. Summit requested an opportunity to confer with NetApp to present an agreed fee amount, or short of that, an opportunity to oppose these unconscionable submissions (A2249). The district court overlooked the request. For the foregoing reasons, if this Court does nothing else, it should at least remand with instructions to correct the award calculation.

## V.     CONCLUSION

For the foregoing reasons, this Court should reverse, or vacate and remand, the district court's September 25, 2014 fee shifting award.

Dated: December 29, 2014          /s/ Robert P. Greenspoon
                                   Robert P. Greenspoon
                                   FLACHSBART & GREENSPOON, LLC
                                   333 North Michigan Avenue
                                   Chicago, Illinois 60601
                                   (312) 551-9500

                                   ATTORNEYS FOR APPELLANT

# ADDENDUM

## <u>TABLE OF CONTENTS TO ADDENDUM</u>

Memorandum, Doc. 260, filed on 09/25/14......................................................ADD-1

Order, Doc. 261, filed on 09/25/14 ...............................................................ADD-10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUMMIT DATA SYSTEMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>EMC CORPORATION, BUFFALO.<br>TECHNOLOGY (USA), INC., D-LINK<br>SYSTEMS, INC., HITACHI DATA<br>SYSTEMS CORPORATION, NETAPP,<br>INC., NETGEAR INC., and QNAP, INC.,<br><br>Defendants. | Civil Action No. 10-749-GMS<br><br>**FILED UNDER SEAL** |

## MEMORANDUM

## I.    INTRODUCTION

Plaintiff Summit Data Systems, LLC ("Summit") brought a patent infringement claim against defendant NetApp, Inc. ("NetApp") and eight other defendants alleging infringement of U.S. Patent Nos. 7,392,291 and 7,428,581 (collectively, "the asserted patents").[1] (D.I. 1.) After settling its claims and dismissing the other defendants, Summit voluntarily dismissed its remaining claims against NetApp with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). (D.I. 234.) Before the court is NetApp's motion for attorneys' fees and costs pursuant to 35 U.S.C. § 285. (D.I. 236.) For the following reasons, the court will grant NetApp's motion and order Summit to pay attorneys' fees and costs.

---

[1] Summit also brought claims against Buffalo Technology, Inc. ("Buffalo"), D-Link Systems, Inc. ("D-Link"), EMC Corporation ("EMC"), Fujitsu America, Inc. ("Fujitsu"), Hitachi Data Systems Corporation ("Hitachi"), Infortrend Corp. ("Infortrend"), Netgear, Inc. ("Netgear"), and Qnap, Inc. ("Qnap"). (D.I. 79.) NetApp is the only remaining defendant in this action.

ADD-1

## II.   BACKGROUND

Acacia Research Group ("Acacia") purchased the asserted patents in February 2010.[2] (D.I. 238, Ex. 6.) Acacia is a publicly traded patent licensing company, commonly referred to as a non-practicing entity. (*Id.* Ex. 5.) Summit is a wholly owned subsidiary of Acacia and now holds title to the asserted patents. (*Id.* Ex. 3 at 13, 66.) According to Summit, its "predecessor-in-interest"—*i.e.*, Acacia—determined that several products on the market practiced one or more claims of the asserted patents. (D.I. 242 at 3.) In particular, Acacia believed that a NetApp server product, when used to form a network with a host computer running a Microsoft operating system, practiced the asserted claims. (D.I. 242 at 3-4.) After acquiring the asserted patents for itself, Summit engaged in a similar analysis and reached the same conclusion. (*Id.* at 4 n.1)

On June 28, 2010, Summit entered into an agreement ("Licensing Agreement") with RPX, a computer industry "patent aggregator" that obtains patent licenses for the benefit of its member companies. (D.I. 237, Ex. 3 at 67; Ex. 8.) By being an RPX member, companies gain access to the large number of patents held or licensed by RPX. The Licensing Agreement between Summit and RPX covered the asserted patents and provided licenses to forty-three member companies, including, notably, Microsoft. (*Id.* Ex. 8.) The Licensing Agreement also provided for a "Patent License Option," allowing RPX to exercise an option at a later time to sublicense the patents to specified "Option Companies." (*Id.*) NetApp was one of four named Option Companies. (*Id.*) At no point, however, did RPX exercise the option for NetApp.

On September 1, 2010, Summit filed this action against NetApp and seven other defendants alleging infringement of the asserted patents. (D.I. 1.) The asserted patents, both titled "Architecture for Providing Block-Level Access over a Computer Network," relate to data

---

[2] Although Acacia has held different names, for simplicity, the court will refer to the entity simply as Acacia, as its history does not materially affect the background facts.

ADD-2

storage systems consisting of a host computer connected by a network to a storage server. (D.I. 1; D.I. 237 at 5.) The innovation claimed in the patents is the concurrent use of multiple logical connections between the host computer and the storage server. (D.I. 237 at 5.) The accused products are storage servers that operate within the claimed network systems; because the accused products only perform a portion of the claimed system, they cannot practice the asserted claims alone, making this an issue of induced infringement. (*Id.*) Only an end-user with a host computer practicing all the claimed elements directly infringes.

Shortly after Summit filed suit, Fujitsu and Netgear both avoided litigation by joining the Licensing Agreement, which provided them with a sublicense for the asserted patents. (D.I. 66; D.I. 134; D.I. 288.) After claim construction proceedings, Summit negotiated settlements with the remaining defendants. Summit dismissed Hitachi for $60,000 (D.I. 238, Ex. 12), D-Link for $170,000 (*Id.* Ex. 13), and Buffalo for $150,000 (*Id.* Ex. 14.) After fact discovery, Summit dismissed Infortrend for $125,000 (*Id.* Ex. 15) and Qnap for $75,000 (*Id.* Ex. 16.)

On April 2, 2012, Summit for the first time disclosed the existence of the Licensing Agreement through discovery. (D.I. 242 at 5.) On October 5, 2012, NetApp informed Summit that the Licensing Agreement, according to its plain terms, licensed the asserted patents to Microsoft. (D.I. 238, Ex. 20.) As such, "no product sold by NetApp can be used in an infringing manner when the end user employs Microsoft's initiator software." (*Id.*) On October 10, 2012, Summit conceded that the Licensing Agreement precluded NetApp's infringement liability for products employing the Microsoft software: "We concur in your interpretation of the license agreement . . . ." (*Id.* Ex. 9.)

On November 9, 2012, Summit dismissed its claims against EMC with prejudice on the condition that EMC would not seek attorney's fees. (D.I. 222.) Summit also moved to dismiss

NetApp with prejudice "with each party to bear its own costs and attorneys' fees." (D.I. 228.) NetApp objected to Summit's motion, wishing to seek attorneys' fees under 35 U.S.C. § 285. The court subsequently granted Summit's motion to dismiss its claims against NetApp with prejudice and allowed NetApp to seek attorneys' fees. (D.I. 234.) NetApp then filed the present motion for attorneys' fees on January 29, 2013. (D.I. 236.)

## III.    STANDARD OF REVIEW

Section 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court recently commented on § 285 and loosened the preexisting standard for what makes a case "exceptional." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014). Under the previous standard outlined by the Federal Circuit, exceptionality could only be established in "two limited circumstances: 'when there has been some material inappropriate conduct,' or when the litigation is both 'brought in subjective bad faith' and 'objectively baseless.'" *Id.* at 1752 (quoting *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (2005)). The prevailing party also had to prove exceptionality by clear and convincing evidence. *Brooks Furniture*, 393 F.3d at 1382. In *Octane Fitness*, however, the Court rejected the Federal Circuit's "rigid" approach, stating that it "impermissibly encumbers the statutory grant of discretion to district courts." [3] *Octane Fitness*, 134 S. Ct. at 1755.

In place of the strict formulation laid out by the Federal Circuit in *Brooks Furniture*, the Supreme Court imposed a rule offering broad discretion to district courts:

---

[3] The parties' briefing was submitted prior the Supreme Court's ruling in *Octane Fitness*, and they therefore apply the old *Brooks Furniture* standard. The court applies the new rule but notes that NetApp likely would have succeeded in its motion under the more restrictive approach as well.

> We hold, then, that an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Id.* at 1756.

The Court drew from a copyright case to present a non-exclusive list of factors for the district courts to consider, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1756 n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)). "[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 1757.

The Supreme Court also rejected the *Brooks Furniture* "clear and convincing evidence" burden. *Id.* at 1758. "[N]othing in § 285 justifies such a high standard of proof. Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one. Indeed, patent-infringement litigation has always been governed by a preponderance of the evidence standard . . . ." *Id.*

## IV.    DISCUSSION

The parties do not dispute that NetApp is a prevailing party as required by § 285. The award of attorneys' fees therefore turns on whether this case is exceptional. In light of the totality of the circumstances, the court finds that it is exceptional. *See id.* at 1756.

From the outset, Summit rested its entire theory of infringement on the premise that NetApp products, when used in conjunction with Microsoft initiator software, infringed the asserted patents. Indeed, one of Acacia's motivations for acquiring the asserted patents in the

5

first place appears to have been its belief that NetApp's product practiced the asserted claims. (D.I. 242 at 3–4.) Throughout litigation, Summit has never been able to identify an alternative theory of infringement that did not require NetApp's products interacting with Microsoft software. (D.I. 238, Ex. 23 at 109–10).

Summit forfeited its right to pursue this theory of infringement against NetApp when it entered into the Licensing Agreement with RPX, which provided Microsoft with a license to the asserted patents. With Microsoft holding a license, direct infringement by a host computer running Microsoft's initiator software was impossible. Consequently, there could be no induced infringement claim against NetApp in this system. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) ("[W]here there has been no direct infringement, there can be no inducement of infringement under § 271(b).")

Nonetheless, Summit brought suit against NetApp barely two months after executing the Licensing Agreement, despite having no other evidence that NetApp's product could infringe the asserted patents in a system not running the Microsoft software. It then took Summit eighteen months to disclose the existence of the Licensing Agreement to NetApp. Throughout this entire time, Summit was still pursuing its theory of infringement against NetApp for a system employing the Microsoft software. Yet, Summit's expert testified that he was unable to determine whether NetApp products in systems running Linux or UNIX, instead of Microsoft, would infringe the asserted patents because he "didn't have time." (D.I. 238, Ex. 23 at 109–10.)

These facts alone (notwithstanding additional contentions NetApp puts forth)[4] support a finding that the case "stands out from others" and is exceptional under § 285. *See Octane Fitness*, 134 S. Ct. at 1756. Summit defends against this label on several grounds. First, Summit

---

[4] NetApp argues that Summit's infringement position was untenable in light of the stipulated claim construction and also that Summit failed to allege scienter as required for induced infringement claims. (D.I. 237 at 13–15.) The court finds it unnecessary to address whether these alleged flaws in Summit's case make it exceptional.

argues the Licensing Agreement was "facially ambiguous" because NetApp was named as an Option Company, eligible for a sublicense. (D.I. 242 at 7–8.) The court dismisses this argument. Summit did not appear to find the License Agreement ambiguous when it readily concurred in its email that "no product sold by NetApp can be used in an infringing manner when the end user employs Microsoft's initiator software." (D.I. 238, Ex. 9.) Moreover, Summit and Acacia are in the business of patent licensing. At best, their argument states they were careless in reading their own multi-million dollar License Agreement before embarking on a lawsuit spanning several years and costing the parties and the court countless resources.

Summit's remaining contentions can be addressed together. Summit argues that license and patent exhaustion are affirmative defenses that NetApp had the burden of proving. (D.I. 242 at 12.) Moreover, Summit argues that, given the market size, it would be "reasonable to assume" that NetApp infringes the asserted patents in some other configuration with a non-RPX member. (D.I. 242 at 11–13; D.I. 238, Ex. 21 at 7.) Although Summit states the correct rule of law, these arguments miss the point. From the moment it licensed the asserted patents to RPX and Microsoft, Summit had no basis for alleging infringement against NetApp. For over two years, Summit nonetheless proceeded on an infringement theory that rested on Microsoft's software being a necessary component. Summit cannot rely on reasonable assumptions and guesses that NetApp infringes the asserted patents in one way or another. And NetApp need not establish an affirmative defense when Summit's sole theory of infringement was unfounded.

Finally, the court finds Summit's practice of extracting settlements worth a fraction of what the case would cost to litigate supports a finding of exceptionality. No settlement with any of the other defendants was for more than $175,000. (D.I. 238, Exs. 12–16.) In EMC's case, Summit cut its losses and dismissed all claims with prejudice in exchange for EMC's release of

ADD-7

its statutory right to seek attorney's fees. The Federal Circuit has looked to "nuisance value settlements" to determine whether a case is exceptional.[5] *See Eon-Net LP v. Flagstar Bancorp*, 653 F.2d 1314, 1327–28 (Fed. Cir. 2011). In *Eon-Net*, the Federal Circuit upheld the district court's determination that a case was exceptional where a non-practicing entity plaintiff sought to extract nuisance value settlements from numerous defendants, for values less than ten percent what it would cost the defendants to litigate. *Id.* The Federal Circuit focused on the high costs for defendants to defend, the burden of complying with discovery, and the minimal risk to non-practicing entities because they have no actual products at stake. *Id.*

The court finds the reasoning in *Eon-Net* applicable here. Although Summit contends that its settlements were calculated according to the value of accused product sales, the court in *Eon-Net* faced a similar settlement payment schedule and found the focus is still on the relative costs to litigate. *Id.* Non-practicing entities like Summit and Acacia are entitled to enforce their patent rights through litigation and seek settlements and licenses. "But the appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith." *Id.* at 1328.

The facts of this case demonstrate that Summit pursued an action against NetApp without any basis for infringement, delayed disclosing the existence of the Licensing Agreement for eighteen months, extracted settlements from co-defendants worth a fraction of what it would actually cost them to defend the lawsuit, and then voluntarily dismissed its claims with prejudice prior to the court issuing a ruling on the merits.[6] Even assuming that Summit was not acting deceptively—"double dipping" as NetApp contends—the court still finds that the factors noted

---

[5] "Subjective bad faith" and the "unreasonable manner in which the case was litigated" are both relevant factors under *Octane Fitness*, as they were under *Brooks Furniture. See Octane Fitness*, 134 S. Ct. at 1756 & n.6.

[6] Of course plaintiffs are free to perform their own cost-benefit analyses, and Summit's decision to voluntarily dismiss its case prior to summary judgment does not, alone, make the case exceptional. When taken together with the additional circumstances, however, Summit's conduct appears much less defensible.

8

in *Octane Fitness* point toward this being an exceptional case. *See Octane Fitness*, 134 S. Ct. at 1756 & n.6. The claims were frivolous—Microsoft's initiator software licensed, so no system employing it could infringe the asserted patents. Summit's motivation was to extract quick settlements that were dwarfed by the costs to litigate. Summit was objectively unreasonable in bringing a lawsuit against NetApp mere months after executing the Licensing Agreement that effectively eliminated its theory of infringement. Finally, the court is convinced that an award of attorneys' fees in this case is necessary to deter this sort of reckless and wasteful litigation in the future.

In light of the totality of the circumstances, the court finds this case to be exceptional and exercises its discretion to award attorneys' fees in favor of NetApp, pursuant to 35 U.S.C. § 285. Summit has not challenged NetApp's calculation of fees, amounting to $1,395,514.62 plus any additional expenses incurred in filing the present motion.

## V.    CONCLUSION

The totality of the circumstances supports the determination that this case is exceptional. Pursuant to 35 U.S.C. § 285, the court grants NetApp's motion for attorneys' fees and cost and orders Summit to pay $1,395,514.62 plus any additional expenses incurred in filing this motion.

Dated: September 25, 2014

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUMMIT DATA SYSTEMS, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>EMC CORPORATION, BUFFALO. )<br>TECHNOLOGY (USA), INC., D-LINK )<br>SYSTEMS, INC., HITACHI DATA )<br>SYSTEMS CORPORATION, NETAPP, )<br>INC., NETGEAR INC., and QNAP, INC., )<br><br>Defendants. ) | Civil Action No. 10-749-GMS<br><br>**FILED UNDER SEAL** |

## <u>ORDER</u>

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. NetApp, Inc.'s Motion for Attorneys' Fees and Costs (D.I. 236) is GRANTED.

2. Summit Data Systems, LLC is directed to pay NetApp in the amount of $1,395,514.62 plus any additional expenses incurred by NetApp in filing this motion.

3. NetApp is directed to provide an updated total to Summit within 14 days.

4. The Clerk of the Court is directed to close this case.

Dated: September **25**, 2014

UNITED STATES DISTRICT JUDGE

ADD-10

## CERTIFICATE OF SERVICE

I, Rose E. Olejniczak, being duly sworn according to law and being over the age of 18, upon my oath deposes and states that:

Counsel Press was retained by Flachsbart & Greenspoon, LLC, Attorneys for Plaintiff-Appellant, Summit Data Systems LLC, to print this document.  I am an employee of Counsel Press.

On December 29, 2014, Flachsbart & Greenspoon authorized me to electronically file the foregoing Brief of Plaintiff-Appellant Summit Data Systems LLC (Confidential and Non-Confidential Versions) with the Clerk of the Federal Circuit using the CM/ECF System, which will serve e-mail notification of such filing to all counsel who are registered as CM/ECF users.

On December 29, 2014, two copies of the Brief of Plaintiff-Appellant Summit Data Systems LLC (Confidential Version) will be sent via prepaid Federal Express overnight delivery addressed to:

Byron Beebe
Edward R. Reines
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

Jack B. Blumenfeld
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
PO Box 1347
Wilmington, DE 19899

Upon acceptance by the Court of the e-filed document, six paper copies of the Brief of Plaintiff-Appellant Summit Data Systems LLC, confidential version will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/  Rose E. Olejniczak
Rose E. Olejniczak

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  This brief contains 10,428 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman type.

/s/ Robert P. Greenspoon